UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------------- X
JOSSELYN ATAHUALPA, MARVIN THOMPSON, PATRICIA CHOU,
and SARA BELLUSCI,

                                       Plaintiffs,

            -against-

THE CITY OF NEW YORK, MAYOR OF THE CITY OF NEW YORK
ERIC ADAMS, CUNY PUBLIC SAFETY INVESTIGATOR TAISH
ROCHESTER, CUNY PUBLIC SAFETY OFFICER KEISHA
FREDERICK, CUNY PUBLIC SAFETY OFFICER CHRISTOPHER
MELENDEZ, CUNY PUBLIC SAFETY OFFICER KATRINA HARRIS,
CUNY PUBLIC SAFETY OFFICER KHALID CLARKE, CUNY PUBLIC
SAFETY OFFICER IRVING RIVERA, CUNY PUBLIC SAFETY
OFFICER JEFFREY PAWELL, CUNY PUBLIC SAFETY OFFICER
DANIEL YACCARINO, NYPD OFFICER GABRIEL FERNANDEZ
(Badge No. 1887), NYPD OFFICER ROBBY VALDEZ (Badge No. 21848),
NYPD OFFICER ANDERSON R. VILLANUEVA (Badge No. 4041),
NYPD OFFICER KIM PIERRE (Badge No. 13800), NYPD SERGEANT
DAYN JOHNSON (Badge No. 4887), NYPD DEFENDANTS JOHN or
JANE DOE #1–50, NYPD PRESS OFFICE DEFENDANTS JOHN OR
JANE DOE #1-5, CUNY DEFENDANTS JOHN or JANE DOE #1–6,
                                      Defendants.
-------------------------------------------------------------------------------------------- X

**VERIFIED
AMENDED
COMPLAINT**

**Docket No.:**
1:25-cv-06245-JPC

**PLAINTIFF
DEMANDS A
TRIAL BY JURY**

Plaintiffs **JOSSELYN ATAHUALPA, MARVIN THOMPSON, PATRICIA CHOU**, and

**SARA BELLUSCI**, by and through their attorneys, Maryanne K. Kaishian and Callen Lowell,

with **KAISHIAN & MORTAZAVI LLC**, attorneys duly licensed to practice before the United

States District Court for the Southern District of New York, hereby complains of Defendants as

follows:

## PRELIMINARY STATEMENT

1.    On April 30, 2024, **PLAINTIFFS JOSSELYN ATAHUALPA, MARVIN**

**THOMPSON, PATRICIA CHOU, and SARA BELLUSCI** were attending a demonstration in

support of the Palestinian people on City College of New York's (CCNY) campus when they were

summarily violently arrested by New York Police Department (NYPD) and City University of New York (CUNY) officers, causing serious physical injuries.

2.      Throughout their arrest and detainment, **DEFENDANT CUNY** and **NYPD MEMBERS** expressed repeated, intense animus towards Plaintiffs' support of Palestinian rights.

3.      That evening, CUNY and NYPD officers engaged in excessive force against **PLAINTIFFS** that was motivated by their repeatedly expressed animus and malice towards **PLAINTIFFS'** protest speech.

4.      **DEFENDANT CITY**, by its NYPD agents and/or employees, then released Plaintiffs' names, addresses, and arrest charges to the news media, including when journalists did not request this information, in further retaliation of Plaintiffs' pro-Palestinian protest speech—a doxing practice in which **DEFENDANT CITY** has declined to engage in matters concerning pro-Israel protester comparators that was designed to punish protesters for their pro-Palestine speech..

5.      This disparate treatment of pro-Palestinian protest speech, including viewpoint-specific excessive force and doxing of protesters, extends up to the highest levels of New York City government, including **DEFENDANT MAYOR ERIC ADAMS**, who accepted campaign funds in exchange for quelling campus pro-Palestine protest just four days before **PLAINTIFFS** were arrested.

6.      **PLAINTIFFS** now bring the instant Complaint against **DEFENDANTS** for, *inter alia*, excessive force, fabrication of evidence, First Amendment retaliation, equal protection violations, and violations of their fair trial rights.

## PARTIES

7.    **PLAINTIFF JOSSELYN ATAHUALPA** (Plaintiff Atahualpa) is, and at all times relevant was, a resident of New York state and a citizen of the United States. She is a resident of Queens County, New York.

8.    **PLAINTIFF MARVIN THOMPSON** (Plaintiff Thompson) is, and at all times relevant was, resident of New York state and a citizen of the United States. He is a resident of Broome County, New York.

9.    **PLAINTIFF PATRICIA CHOU** (Plaintiff Chou) is, and at all times relevant was, resident of New York state and a citizen of the United States. She is a resident of Queens County, New York.

10.    **PLAINTIFF SARA BELLUSCI** (Plaintiff Bellusci) is, and at all times relevant was, a citizen of the United States. She is a resident of Kings County, New York.

11.    At all relevant times mentioned herein, **DEFENDANT CITY OF NEW YORK** ("Defendant City" or "New York City") was and is a municipal corporation duly organized and existing under the laws of the State of New York, acting by and through its agencies, including but not limited to the New York City Police Department ("NYPD") and its employees and agents.

12.    **DEFENDANT NEW YORK CITY MAYOR ERIC ADAMS** ("Defendant Adams"), at all relevant times, was the Mayor of New York City. As the "chief executive officer of the city," New York City Charter § 3, Defendant Adams had final authority over the appointment and/or removal of NYPD employees and agents, including the New York City Police Commissioner. As the Mayor of the City of New York, Defendant Adams has the authority to shape NYPD policies and responses to public events. Furthermore, Defendant Adams accepted campaign donations for his reelection campaign explicitly in connection with treatment of campus protesters including

Plaintiffs. Defendant Adams further personally accepted an offer for business executives to fund private investigators to curtail campus protests, such as those engaged in by Plaintiffs. Defendant Adams is sued in his individual and official capacities.

13.     **DEFENDANT CUNY PUBLIC SAFETY INVESTIGATOR TAISH ROCHESTER** ("Defendant Rochester") at all relevant times, was a Public Safety Investigator employed by the State of New York through CUNY. Defendant Rochester was directly involved in the arrest, detention, interrogation, or related enforcement against each Plaintiff. Defendant Rochester testified against Plaintiffs in each of their criminal complaints and contributed additional information in the incident section of their complaints' supplementary facts. Defendant Rochester was directly involved in Plaintiff Marvin Thompson's and Plaintiff Josselyn Atahualpa's arrest, detention, interrogation, and/or related enforcement, and listed as an "Interviewing Officer" for both on the Trial Bureau Datasheet under the Command of "NYC Sheriff." Further, Defendant Rochester was listed as a Police Witness and named as the Reporting Officer against all Plaintiffs. Defendant Rochester signed the Felony Complaint against Plaintiff Thompson and Plaintiff Atahualpa. Defendant Rochester further signed the Felony Complaint against Plaintiff Sara Bellusci and Plaintiff Patricia Chou. At all relevant times, Defendant Rochester was acting within the scope of her employment and in her capacity as an agent and/or employee of CUNY and the State of New York. She is sued in her individual capacity.

14.     **DEFENDANT CUNY PUBLIC SAFETY OFFICER KEISHA FREDERICK** (Tax #001974) ("Defendant Frederick") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Frederick was involved in each of Plaintiffs' arrest. She contributed directly to the arrest, detention, interrogation, and other related enforcement relating directly to Plaintiffs Patricia Chou and Sara Bellusci. Defendant Frederick was listed as a

Police Witness and named as the Arresting Officer as to all Plaintiffs both in Plaintiffs' Datasheet and in Plaintiffs' Patricia Chou's and Sara Bellusci's mass arrest criminal complaint. At all relevant times, Defendant Frederick was acting within the scope of her employment and in her capacity as an agent and/or employee of CUNY and the State of New York. She is sued individually and in her official capacity.

15. **DEFENDANT CUNY PUBLIC SAFETY OFFICER CHRISTOPHER MELENDEZ** ("Defendant Melendez") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Melendez was directly involved in Plaintiff Marvin Thompson's and Plaintiff Josselyn Atahualpa's arrest, detention, interrogation, and/or related enforcement, and listed as an "arresting officer" for both on the Trial Bureau Datasheet under the Command of "NYC Sheriff." At all relevant times, Defendant Melendez was acting within the scope of his employment and in his capacity as an agent and/or employee of CUNY and the State of New York. He is sued in his individual capacity.

16. **DEFENDANT CUNY PUBLIC SAFETY OFFICER KATRINA HARRIS** ("Defendant Harris") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Harris was directly involved in Plaintiffs' Patricia Chou and Sara Bellusci's arrest, detention, interrogation, and/or related enforcement. Defendant Harris was listed on the Datasheet as being the "arresting officer" for Plaintiffs Bellusci and Harris while working under the "command" of "NYC Sheriff." Further, Defendant Harris was specifically named in the mass arrest Complaint # 2024-026-001485 as the Reporting/Investigating M.O.S, wherein Plaintiffs Chou and Bellusci's arrests were listed. At all relevant times, Defendant Harris was acting within the scope of her employment and in her capacity as an agent and/or employee

of CUNY and the State of New York. For her direct involvement and in her failures to intervene in the injustices imposed upon Plaintiffs, she is sued individual capacity.

17.    **DEFENDANT CUNY PUBLIC SAFETY OFFICER KHALID CLARKE (**"Defendant Clarke") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Clarke was directly involved in Plaintiffs' Patricia Chou, Sara Bellusci, Josselyn Atahualpa, and Marvin Thompson's arrest, detention, interrogation, and/or related enforcement. Defendant Clarke was specifically named in Plaintiff Chou's Prisoner Movement Slip as an arresting officer. Defendant Clarke was named in the Trial Bureau Datasheet as an arresting officer of both Plaintiff Atahualpa and Plaintiff Thompson. Defendant Clarke was also named in the Trial Bureau Datasheet as an arresting officer of Plaintiff Bellusci and Chou. At all relevant times, Defendant Clarke was acting within the scope of his employment and in his capacity as an agent and/or employee of CUNY and the State of New York. He is sued in his individual capacity.

18.    **DEFENDANT CUNY PUBLIC SAFETY OFFICER IRVING RIVERA** ("Defendant Rivera") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Rivera was directly involved in Plaintiffs Josselyn Atahualpa, Patricia Chou, and Sara Bellusci's arrest, detention, interrogation, or related enforcement. Defendant Rivera failed to intervene in Plaintiffs' unjust treatment by fellow officers. At all relevant times, Defendant Clarke was acting within the scope of his employment and in his capacity as an agent and/or employee of CUNY and the State of New York. He is sued in his individual capacity.

19.    **DEFENDANT CUNY PUBLIC SAFETY OFFICER JEFFREY PAWELL** ("Defendant Pawell") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Pawell was directly involved in arresting Plaintiffs.

Defendant Pawell was in the administrative building attempting to physically restrain Plaintiff Sara Bellusci while she was in the bathroom. At all relevant times, Defendant Pawell was acting within the scope of his employment and in his capacity as an agent and/or employee of CUNY and the State of New York. He is sued in his individual capacity.

20.     **DEFENDANT CUNY PUBLIC SAFETY OFFICER DANIEL YACCARINO** (Badge No. 546) ("Defendant Yaccarino") at all relevant times, was a Public Safety Officer employed by the State of New York through CUNY. Defendant Yaccarino was directly involved in the arrest, detention, transport to One Police Plaza (1PP), and the processing of Plaintiff Josselyn Atahualpa. At all relevant times, Defendant Yaccarino was acting within the scope of his employment and in his capacity as an agent and/or employee of CUNY and the State of New York. He is sued in his individual capacity.

21.     **DEFENDANT NYPD OFFICER GABRIEL FERNANDEZ** (Badge No. 1887, Tax #965091) ("Defendant Fernandez") at all relevant times, was a police officer employed by Defendant City through its police department, the NYPD. Defendant Fernandez was directly involved in Plaintiff Marvin Thompson's arrest and transport to 1PP. At all relevant times, Defendant Fernandez was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City. Defendant Fernandez is sued in his individual capacity and as an employee and/or agent of Defendant City.

22.     **DEFENDANT NYPD OFFICER ROBBY VALDEZ** (Badge No. 21848, Tax #972488) ("Defendant Valdez") at all relevant times, was a police officer employed by Defendant City through its police department, the NYPD. Defendant Valdez was directly involved in Plaintiff Marvin Thompson's arrest and transport to 1PP.  Throughout the duration of Plaintiff Thompson's transport to 1PP Plaintiff remained in Defendant Valdez's custody while suffering pain and injuries

due to the overly tight wrist restraints that Defendant Valdez refused to adequately loosen. At all relevant times, Defendant Fernandez was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City. Defendant Valdez is sued in his individual capacity and as an employee and/or agent of Defendant City.

23.    **DEFENDANT NYPD OFFICER ANDERSON R. VILLANUEVA** (Badge No. 4041, Tax #970926) ("Defendant Villanueva") at all relevant times, was a police officer employed by Defendant City through its police department, the NYPD. Defendant Villanueva was specifically named in the mass arrest Complaint #2024-026-001485, where Plaintiff Atahualpa's arrest was listed. At all relevant times, Defendant Fernandez was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City. Defendant Valdez is sued in his individual capacity and as an employee and/or agent of Defendant City.

24.    **DEFENDANT NYPD OFFICER KIM PIERRE (**Badge No. 13800, Tax #940582) ("Defendant Pierre") at all relevant times, was a police officer employed by Defendant City through its police department, the NYPD. Defendant Pierre was directly involved in Plaintiff Marvin Thompson's arrest and processing at One Police Plaza. He utilized excessive force by refusing to loosen excessively tight handcuffs. Defendant Pierre was one of several officers who forced Plaintiff Thompson to remain in handcuffs for 5 hours. At all relevant times, Defendant Pierre was acting within the scope of his employment and in his capacity as an agent and/or employee of Defendant City. Defendant Pierre is sued in his individual capacity and as an employee and/or agent of Defendant City.

25.    **NYPD DEFENDANTS JOHN and JANE DOE #1–50** are NYPD officers whose names and shield numbers are not presently unknown. They were, at all relevant times, employed by Defendant City through its police department, the NYPD. They are sued in their individual and

official capacities. Upon information and belief, they were involved in the planning, enforcement, supervision, or concealment of the acts described herein.

26.    **NYPD PRESS OFFICE DEFENDANTS JOHN OR JANE DOE #1-5** are NYPD members whose names and shield numbers are not presently unknown. They were, at all relevant times, employed by Defendant City through its police department, the NYPD. They are sued in their individual and official capacities. Upon information and belief, they were involved in releasing Plaintiff's home addresses to the press to dox and punish Plaintiffs, despite not releasing the same information for similarly-situated pro-Israel protesters.

27.    **DEFENDANTS CUNY OFFICERS JOHN and JANE DOE #1–6** are CUNY officers whose names and shield numbers are not presently unknown. They were, at all relevant times, employed by CUNY and the State of New York. They are sued in their individual and official capacities. Upon information and belief, these Defendants were involved in the planning, enforcement, supervision, or concealment of the acts described herein. Defendant CUNY Does are sued in their respective individual capacities.

28.    For each employee and/or agent of Defendant City, including those employed by Defendant City's NYPD, every act and omission by the individual Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

29.    The individual NYPD Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

30.    The individual CUNY Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant State who were acting for, on behalf of, and with the power and authority vested in them by the State of New York and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

31.    As indicated in arrest paperwork and arrest datasheets, individual **CUNY DEFENDANTS** were  further deputized as agents of the NYPD and Defendant City as acting under the command of "NYC Sheriff" who were acting for, on behalf of, and with the power and authority vested in them by Defendant City and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties. Individual CUNY defendants acted as agents of Defendant City in arresting, accompanying during arrest transport, and assisting with arrest processing of Plaintiffs at 1 Police Plaza.

32.    All Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

33.    At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

34.    Although they were aware of the conduct, present for it, and knew or should have known it was unconstitutional, at no time did any of the Defendants take any steps to intervene in, the abusive and/or constitutionally and legally deficient conduct of their colleagues.

35.     The conduct of the officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of **DEFENDANT CITY**, cloaked with and/or invoking state power and/or authority.

36.     The negligent and/or tortious conduct of the CUNY employees alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as peace officers, and/or while they were acting as agents and employees of the State of New York, cloaked with and/or invoking state power and/or authority.

## JURISDICTION AND VENUE

37.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343, 1367, and 42 U.S.C. § 1983.

38.     Venue is proper, pursuant to 28 U.S.C. § 1391, et seq., in the Southern District of New York, where a majority of the actions complained of herein occurred.

39.     The monetary damages amount sought by Plaintiff exceeds $150,000.00.

40.     Plaintiffs timely served Notices of Claim upon **DEFENDANT CITY** within 90 days of their arrest and complied with all conditions precedent to commencing an action under state law.

41.     Plaintiffs each timely served Notices of Intention upon the State of New York within 90 days of the date of their arrest.

42.     **PLAINTIFF ATAHUALPA** was examined by the **DEFENDANT CITY** pursuant to GML §50-h on November 15, 2024.

43.     **PLAINTIFF THOMPSON** was examined by the **DEFENDANT CITY** pursuant to GML §50-h on October 25, 2024.

44.     **PLAINTIFF CHOU** was examined by the **DEFENDANT CITY** pursuant to <u>GML §50-h</u> on November 15, 2024.

45.     **PLAINTIFF BELLUSCI** was examined by the **DEFENDANT CITY** pursuant to <u>GML §50-h</u> on December 6, 2024.

46.     At least thirty days have elapsed since service of Plaintiffs' Notices of Claim and adjustment and payment thereof has been neglected or refused.

47.     This action was initiated within one year and ninety days of the accrual of all Plaintiff's claims pursuant to New York State Law and within three years of the accrual of all Federal Law claims.

## <u>STATEMENT OF MATERIAL FACTS</u>

### <u>*Defendant Adams'* Quid Pro Quo *Agreement to Quell Pro-Palestine Protests*</u>

48.     On April 26, 2024, four days before Plaintiffs' arrest, a group of business leaders, including Daniel Lubetzky, Len Blavatnik, Daniel Loeb, and Joseph Sitt, as well as Individuals #1-5, met with **DEFENDANT MAYOR ERIC ADAMS** to urge **DEFENDANT ADAMS** to send the NYPD to stop the pro-Palestine student protests at Columbia and other institutions of higher learning, such as CUNY. *See* **Exhibit 10**.

49.     This request to silence pro-Palestine speech on campuses was accompanied by promises of a *quid pro quo* agreement for Individuals # 1-5 and their networks to funnel funds to **DEFENDANT ADAMS** and the NYPD, including through providing private security and through funding Defendant Adams' reelection campaign.

50.    This meeting and its subject matter was reported by *The Washington Post* on May 16, 2024.[1]

51.    The business leaders were part of a WhatsApp group chat initiated by a staffer of Barry Sternlicht that contained about 100 members titled "Israel Current Events," which had a stated goal to "change the narrative" of public perception in favor of Israel.

52.    The special interest group members attended private Zoom briefings from then-war cabinet member Benny Gantz, former prime minister of Israel Naftali Bennett, and Isaac Herzog, the president of Israel, about Israel's siege on Gaza and Palestinians.

53.    The members then met with **DEFENDANT MAYOR ERIC ADAMS** in an April 26, 2024, Zoom meeting.

54.    In the meeting with **DEFENDANT ADAMS**, Individuals # 1-5, members of this group, offered to pay for private investigators to assist New York police in "handling" or stopping the pro-Palestinian protests.

55.    Joseph Sitt stated in the WhatsApp chat, "He's open to any ideas we have," and "As you saw he's ok if we hire private investigators to then have his police force intel team work with them."

56.    **DEFENDANT ADAMS** accepted this offer.[2]

57.    In exchange for his agreement to direct the disparate treatment of pro-Palestine demonstrators, **DEFENDANT ADAMS**, individually and by his campaign, received specific monetary and political favors.

---

[1] Hannah Natanson and Emmanuel Felton, *Business Titans Privately Urged NYC Mayor to Use Police on Columbia Protesters, Chats Show,* Washington Post (May 16, 2024), https://www.washingtonpost.com/nation/2024/05/16/business-leaders-chat-group-eric-adams-columbia-protesters/.
[2] *Id.*

58.    **DEFENDANT ADAMS'** campaign donation link was shared in the chat.

59.    One member of the group, Joseph Sitt, indicated that he was arranging a "code" for donations connected to **DEFENDANT ADAMS'** "efforts to fight antisemitism" in the context of quelling pro-Palestine protests.

60.    In the written minutes shared after the Zoom meeting with **DEFENDANT ADAMS**, action items including resharing a link to donate to **DEFENDANT ADAMS'** reelection campaign and paying for "investigative efforts" to assist the NYPD in stopping pro-Palestinian demonstrators and organizers.

61.    These "investigative efforts" were intended, in part, to identify protesters for public targeting, including professional blacklisting of such protesters for their pro-Palestinian protests.

62.    A day after the April 26 Zoom, Loeb write the group chat stating, "I'll be grateful when the perpetrators are dragged off campus," referencing the pro-Palestine protesters on NYC campuses.

63.    Within a week of this meeting, the NYPD attacked and arrested **PLAINTIFFS** for their peaceful and lawful pro-Palestinian speech at the CCNY campus, and **NYPD PRESS OFFICE DEFENDANTS JOHN OR JANE DOE #1-5** shared **PLAINTIFFS'** names and full addresses with the media, who published this information to the public.

64.    The **NYPD PRESS OFFICE DEFENDANTS** do not share this name and address information with the media similarly-situated comparators, such as arrested pro-Israel protesters.

65.    **PLAINTIFFS** had a limited privacy interest in their home address, and the public release of their names and addresses were done with the intention of targeting them for professional blacklisting for their pro-Palestinian speech to punish them for pro-Palestinian speech.

66.     Upon information and belief, these actions were undertaken with the direct approval of **DEFENDANT ADAMS**.

67.     These actions were undertaken for the express purpose of targeting and silencing pro-Palestine speech.

68.     **DEFENDANT ADAMS** oversaw these actions, including targeting of **PLAINTIFFS** for their speech, using excessive force against **PLAINTIFFS**, and doxing **PLAINTIFFS**, in exchange for promised quid pro quo financial and political benefits.

### *The April 30, 2025 Arrests*

69.     On the evening of April 30, 2024, **PLAINTIFFS** were lawfully present during regular hours in the City College of New York (CCNY) campus.

70.     The CCNY campus, located at 160 Convent Ave, New York, NY, is open to the public and is integrated into public areas of the City of New York accessible by public walkways and roadways.

71.     At the above approximate time and place, **PLAINTIFFS** participated in a peaceful demonstration in support of the Palestinian people.

72.     **PLAINTIFFS** engaged in protected speech as part of this demonstration.

73.     **PLAINTIFFS** were lawfully present on public and/or school property and had committed no crimes or violations at the time of their arrest.

74.     **PLAINTIFFS**, and other fellow demonstrators, were informed by CCNY that they would be permitted to lawfully remain on campus pending an upcoming administrative decision as to the status of the presence of protesters such as **PLAINTIFFS**.

75.     Instead, without warning and without providing an opportunity for **PLAINTIFFS** to vacate the area, **DEFENDANT CUNY MEMBERS** and **DEFENDANT NYPD MEMBERS**, together,

suddenly locked campus gates and otherwise blocked **PLAINTIFF'S** paths of egress from the campus at approximately 8:00 PM.

76.    **DEFENDANTS** provided no actionable lawful warning to **PLAINTIFFS** to disperse prior to this action.

77.    After blocking all paths of egress, **DEFENDANT NYPD MEMBERS** issued orders to disperse that were physically impossible for **PLAINTIFFS** to follow, and summarily arrested **PLAINTIFFS** for allegedly failing to follow these impossible orders.

*Plaintiff Josselyn Atahualpa*

78.    **PLAINTIFF JOSSELYN ATAHUALPA** was a CUNY student lawfully present at CCNY.

79.    On April 30, 2024, **PLAINTIFF ATAHUALPA** was attending the peaceful and lawful demonstration in support of Palestinian rights.

80.    Without warning, at approximately 8:00 PM, CUNY and NYPD Defendants suddenly locked campus gates and otherwise blocked Plaintiff Atahualpa's paths of egress from campus.

81.    **PLAINTIFF ATAHUALPA** did not enter any CUNY buildings during this time period.

82.    No **DEFENDANTS** issued lawful orders to disperse.

83.    At no time did **PLAINTIFF ATAHUALPA** refuse to comply with lawful commands, pose a risk to the safety of **DEFENDANTS** or others, or attempt to flee custody.

84.    **DEFENDANTS** possessed no warrant or probable cause for the arrest of **PLAINTIFF ATAHUALPA**.

85.    Without warning, **PLAINTIFF ATAHUALPA** was detained and arrested.

86.    **DEFENDANT CUNY DOE #1**, appearing to be a Latina officer who wore her hair in a bun detained Plaintiff Chou and Plaintiff Atahualpa on campus.

87.    **DEFENDANT CUNY DOE #1** summoned over four other CUNY officers.

88.    Two of these Defendants together, **CUNY DEFENDANT DOES #2 AND #3**, who each appeared to be male, led Plaintiff Atahualpa into a CUNY building with her hands behind her back and forced Plaintiff to remain there for approximately five hours while handcuffed and in detention.

89.    Once in the building, **CUNY DEFENDANT IRVING RIVERA** yanked Pl **PLAINTIFF ATAHUALPA** from behind and applied overly tight handcuffs to Plaintiff Atahualpa's wrists.

90.    Defendants caused pain, bruising, and swelling to **PLAINTIFF ATAHUALPA**'s wrists, shoulders, and back via these overly tight handcuffs.

91.    Upon information and believe, Defendants used excessive force against **PLAINTIFF ATAHUALPA** with malice because of her pro-Palestinian protest speech. This malice was demonstrated throughout the evening of the arrest by Defendants' malicious and disparaging comment about the protest speech.

92.    **CUNY DEFENDANT DOES #2 AND #3** and **CUNY DEFENDANT RIVERA** forcibly escorted **PLAINTIFF ATAHUALPA** into a room in the CUNY building, where she was detained with other protesters.

93.    In the room, **PLAINTIFF ATAHUALPA** witnessed **CUNY DEFENDANT KEISHA FREDERICK, CUNY DEFENDANT KHALID CLARKE**, and **CUNY DEFENDANT DOE #6**, who appeared to be a white man, targeting a Palestinian protester and mocking her Palestinian ethnicity.

94.    In the room, these **CUNY DEFENDANT FREDERICK, CUNY DEFENDANT CLARKE**, and other CUNY Members, together and individually, intentionally broke glass, threw

items around the room to intentionally make it look destroyed, and chipped away at items in the room to break them, deliberately fabricating evidence against **PLAINTIFFS**.

95.    When the Palestinian protester noted that the officers were picking items up and planting them on her, these **DEFENDANTS** laughed and continued to fabricate evidence.

96.    Defendants deliberately fabricated this evidence against the protesters including Plaintiff because of their pro-Palestinian speech, and because **PLAINTIFF ATAHUALPA** and others associated with those of Palestinian national origin.

97.    Defendant NYPD members, including  **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE** and **CUNY DEFENDANT YACCARINO,** escorted **PLAINTIFF ATAHUALPA** out of the building around 11:00 PM and forced **PLAINTIFF ATAHUALPA** to stand along Amsterdam Avenue for approximately three (3) hours.

98.    During this period, **PLAINTIFF ATAHUALPA** repeatedly informed **DEFENDANTS FREDERICK, CLARKE, AND VACCARINO** that her handcuffs were overly tight and were causing her pain and restricting her blood flow.

99.    These **DEFENDANTS** repeatedly refused to loosen these handcuffs.

100.    At approximately 2:00 AM on May 1, 2024, **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE** and **CUNY DEFENDANT YACCARINO** forced **PLAINTIFF ATAHUALPA** onto a bus.

101.    **CUNY DEFENDANT YACCARINO** transported **PLAINTIFF ATAHUALPA** to 1 Police Plaza (1PP) in New York County.

102.    **CUNY DEFENDANT YACCARINO** forced **PLAINTIFF ATAHUALPA** to remain on the bus for approximately four (4) hours before permitting Plaintiff to enter 1PP.

103. While on the bus, **PLAINTIFF ATAHUALPA** repeatedly put **CUNY DEFENDANT YACCARINO** on notice of the pain she was in from the overly tight handcuffs, including to her back.

104. **PLAINTIFF ATAHUALPA** was crying from the intense physical pain Defendants were causing to her back from the handcuffs.

105. **PLAINTIFF ATAHUALPA** began to lose consciousness while on the MTA bus due to the overly-tight handcuffs, which **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE**, and **CUNY DEFENDANT YACCARINO** refused to loosen.

106. When walking Plaintiff Atahualpa from the bus to 1PP, Plaintiff's legs began to give out from the pain on the walk, which **CUNY DEFENDANT YACCARINO** noted, asking if **PLAINTIFF ATAHUALPA** needed to pause.

107. **DEFENDANT YACCARINO** still did not loosen or change her cuffs.

108. In total, **PLAINTIFF ATAHUALPA** was in these overly tight handcuffs, which were never loosened, for approximately nine (9) hours—from approximately 9pm until she was placed in a cell at 1PP at approximately 6:00 AM.

109. **PLAINTIFF ATAHUALPA** remained in the custody of **CUNY DEFENDANT YACCARINO**, **NYPD DEFENDANT JOHNSON**, and **NYPD DEFENDANT DOES #1 - 5** while present at 1PP, where she was forced to languish without food, potable water, access to phone calls, access to medical care, access to bathrooms and basic hygiene, and in overcrowded cells.

110. **PLAINTIFF ATAHUALPA** was distressed because of the discriminatory treatment and excessive force she experienced.

111.    Defendant's conduct made **PLAINTIFF ATAHUALPA** cry in pain and due to fear while in 1PP and while at bookings.

112.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to experience pain, bruising and swelling to her wrists and arms, reduced range of motion, nerve damage, back pain, and other physical pain and injuries, the full extent of which are not yet known.

113.    **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE**, **CUNY DEFENDANT DOES #1 – 5**, and **NYPD DEFENDANT DOES #1 - 20** provided false information likely to prejudice a finder of fact against **PLAINTIFF ATAHUALPA** to the New York County District Attorney's Office and induced the criminal prosecution against her.

114.    Defendants falsely provided information stating that **PLAINTIFF ATAHUALPA** had been asked to leave campus and warned that she must vacate the premises prior to her arrest.

115.    **DEFENDANT TAISH ROCHESTER**'s signed felony criminal complaint stated that she, "observed the above-listed defendants inside of . . .a City College of New York campus building, without permission and authority."

116.    The complaint further falsely accused **PLAINTIFF ATAHUALPA** of "blocking doors with furniture" and "throwing items at responding officers."

117.    These allegations were false.

118.    **DEFENDANT TAISH ROCHESTER** was aware that the information contained in the complaint was false.

119.    P**LAINTIFF ATAHUALPA** never wrongfully entered any CUNY buildings that evening and had not engaged in the further wrongful conduct **DEFENDANTS** alleged against her.

120.    This false information provided, which was intended to prejudice a finder of fact and to induce **PLAINTIFF's** criminal prosecution, also included **CUNY DEFENDANT FREDERICK**

and **CUNY DEFENDANT CLARKE** falsely staging and damaging the CUNY building property to appear ransacked and/or damaged by **PLAINTIFFS**, and these Defendants' false allegations of property damage against **PLAINTIFFS**.

121.    At approximately 11:00 PM on May 1, 2024, **NYPD DEFENDANT DOES #18 - 22** transported Plaintiff to Manhattan Criminal Court at 100 Centre St.

122.    **PLAINTIFF ATAHUALPA** remained in NYPD custody until she was arraigned at approximately 3:00 PM on May 2, 2024, despite her rights under New York State law, including the fact that Plaintiff's charges qualified her for a mandatory Desk Appearance Ticket in lieu of custodial arrest pursuant to CPL § 150.20.

123.    After her release from detention, **PLAINTIFF ATAHUALPA's** injuries forced her to see a doctor.

124.    **PLAINTIFF ATAHUALPA** sought medical care from Dr. Sapna Shah for her back pain and bruised wrists.

125.    Defendants' conduct further forced **PLAINTIFF ATAHUALPA** to seek mental health treatment due to the effects of Defendants' conduct.

126.    The full extent of **PLAINTIFF ATAHUALPA's** emotional injuries are not yet known, and their effects are ongoing.

127.    **PLAINTIFF ATAHUALPA** was permanently and wrongly deprived by Defendants pursuant to her arrest of property, including, *inter alia*, approximately $100 cash, a backpack, a sleeping bag, a winter jacket, and other property totaling approximately $800 in value.

128.    Thereafter, in retaliation for the content of **PLAINTIFF ATAHUALPA's** speech, and/or in order to chill future speech by Plaintiff, **NYPD DEFENDANT DOES #23 - 2 7**, under the supervision of DCPI Commissioner Kaz Daughtry, an official spokesperson and agent and/or employee and policymaker for **DEFENDANT CITY**, released personal information, including

21

PLAINTIFF ATAHUALPA's address, date of birth, and other sensitive information, to members of the media. This conduct chilled **PLAINTIFF ATAHUALPA**'s exercise of her free speech, including by making **PLAINTIFF** fearful of and disincentivized to engage in future protest speech that she otherwise would have engaged in, and fearful of having a public online presence or engaging in public online speech due to the doxing.

129.    The criminal matter against **PLAINTIFF ATAHUALPA** terminated in her favor when it was dismissed in its entirety on June 12, 2024.

130.    At no time did any **NYPD DEFENDANTS** protect **PLAINTIFF ATAHUALPA**, mitigate the risks posed to her, or intervene in their fellow Defendants' deficient conduct towards her.

131.    Dozens of **DEFENDANT CITY's** NYPD MEMBERS present for the unlawful arrest and detention of **PLAINTIFF ATAHUALPA**. These NYPD members declined to intervene on **PLAINTIFF ATAHUALPA's** behalf despite possessing the notice, duty, and opportunity to do so.

132.    Following her arrest, CUNY and Queens College opened disciplinary proceedings against **PLAINTIFF ATAHUALPA** as a result of her pro-Palestinian speech.

133.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to experience significant damages.

134.    As a result of her detention, legal proceedings, and preparing for legal proceedings, Plaintiff Atahualpa lost approximately two weeks of work.

135.    Due to being doxed in relation to this case by Defendants, **PLAINTIFF ATAHUALPA** lost work opportunities and opportunities for professional advancement.

136.    As a result of Defendants' conduct during her arrest and detention, **PLAINTIFF ATAHUALPA** experienced physical pain and suffering, bruising, swelling, lacerations and reduced range of motions to her wrists, shoulders, and hands.

137.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to experience back pain for at least thirty (30) days following the arrest.

138.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to experience intense physical and psychological effects from these events.

139.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to suffer intense bouts of crying for approximately six months following the arrest.

140.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to experience an increase in her blood pressure, which resulted in having to begin taking Amlodipine for high blood pressure in September 2024.

141.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to experience hair loss and weight gain, insomnia, nightmares, panic attacks, and stress.

142.    Defendants' conduct caused **PLAINTIFF ATAHUALPA** to suffer the deprivation of liberty, emotional anguish, post-traumatic stress, anxiety, fear, lost income, and additional damages. The full extent of **PLAINTIFF ATAHUALPA's** injuries are not yet known, and their effects are ongoing.

***Plaintiff Marvin Thompson***

143.    On April 30, 2024, **PLAINTIFF MARVIN THOMPSON** was attending the peaceful and lawful demonstration in support of Palestinian rights on CCNY's campus.

144.    **PLAINTIFF THOMPSON** was handing out blankets and other essential lawful items to protesters.

145.    Without warning, at approximately 8:00 PM, CUNY and NYPD Defendants, together and individually, suddenly locked campus gates and otherwise blocked **PLAINTIFF THOMPSON's** paths of egress from campus.

146.    Approximately twenty (20) Defendant NYPD members simultaneously surrounded **PLAINTIFF THOMPSON** and other demonstrators present at CCNY, closing in and creating a kettle, forcing **PLAINTIFF THOMPSON** into close proximity with demonstrators and blocking all paths of egress.

147.    This kettle prevented **PLAINTIFF THOMPSON** from leaving.

148.    This conduct further caused **PLAINTIFF THOMPSON** fear and anxiety.

149.    NYPD or CUNY Public Safety did not issue actionable and lawful directives to disperse.

150.    **NYPD DEFENDANT DOE #18** and **CUNY DEFENDANT MELENDEZ** then yanked **PLAINTIFF THOMPSON's** wrists from behind and applied overly tight handcuffs to **PLAINTIFF THOMPSON's** wrists.

151.    Defendants' application of overly tight handcuffs caused pain, bruising, and swelling to wrists, shoulders, and back, causing **PLAINTIFF THOMPSON's** right wrist to turn blue.

152.    **PLAINTIFF THOMPSON** repeatedly requested for **NYPD DEFENDANT DOE #18** and **CUNY DEFENDANT MELENDEZ** to loosen the overly tight handcuffs due to the pain they were causing.

153.    **NYPD DEFENDANT DOE #18** and **CUNY DEFENDANT MELENDEZ** refused to loosen the handcuffs despite these requests from Plaintiff Thompson.

154.    During the time period that the **DEFENDANTS DOE # 18 and MELENDEZ** refused to loosen **PLAINTIFF THOMPSON's** handcuffs, these **DEFENDANTS** also pulled and yanked

**PLAINTIFF THOMPSON** by these handcuffs, forcing his arms, wrists, and back into unnatural positions and causing him pain, bruising, and swelling.

155.    Upon information and believe, Defendants used excessive force against **PLAINTIFF THOMPSON** with malice because of his pro-Palestinian protest speech. This malice was demonstrated throughout the evening of the arrest by Defendants' malicious and disparaging comment about the protest speech.

156.    **DEFENDANTS** possessed no warrant or probable cause for the arrest of **PLAINTIFF THOMPSON.**

157.    At no time did **PLAINTIFF THOMPSON** refuse to comply with lawful commands, pose a risk to the safety of **DEFENDANTS** or others, or attempt to flee custody.

158.    **NYPD DEFENDANT DOE  #18** and **CUNY DEFENDANT MELENDEZ** then forced Plaintiff Thompson into a CUNY building on the CCNY campus and forced Plaintiff Thompson to remain there for approximately five (5) hours while handcuffed and in detention.

159.    **NYPD DEFENDANT FERNANDEZ** and **NYPD DEFENDANT VALDEZ** forced Plaintiff Thompson onto a NYPD van.

160.    **NYPD DEFENDANT FERNANDEZ** and **NYPD DEFENDANT VALDEZ** transported Plaintiff Thompson to 1PP in New York County.

161.    Plaintiff Thompson remained in the custody of **NYPD DEFENDANT FERNANDEZ**, **NYPD DEFENDANT VALDEZ**, **NYPD DEFENDANT PIERRE** and **NYPD DEFENDANT DOES #18 - 22** while present at 1PP, where he was forced to languish without food, potable water, access to phone calls, access to medical care, access to bathrooms and basic hygiene, and in overcrowded cells. Despite requests, all defendants refused to loosen Plaintiff Thompson's handcuffs while he was in custody at 1PP.

162.    NYPD officers of the Strategic Response Group intentionally made the conditions of the confinement worse, both on campus and at 1PP because of **PLAINTIFF THOMPSON'S** pro-Palestine speech.

163.    One NYPD Defendant Doe, **NYPD DEFENDANT DOE #28**, a heavyset Black officer with facial hair, guarded the door to the main holding cell.

164.    This Defendant would periodically mock and berate **PLAINTIFF THOMPSON** and other protesters for their political speech, opening the door and repeatedly shouting, "Go Israel."

165.    Another NYPD Defendant Doe, **NYPD DEFENDANT DOE #29**, a tall, heavyset white man with a long ponytail repeatedly threatened detained protesters at 1PP, including **PLAINTIFF THOMPSON**, challenging **PLAINTIFF THOMPSON** to a physical fight. At no time did Plaintiff Thompson threaten or attempt to fight this Defendant or any officer.

166.    While at **DEFENDANT CITY's** 1PP, the only water source available was attached to the toilet and provided dirty and unpotable water.

167.    When Plaintiff Thompson and others requested clean drinking water at 1 Police Plaza, **NYPD DEFENDANT DOE #30**, a bald Asian man with a short last name, said, in sum and substance, "Go fuck yourself."

168.    This NYPD member further mocked **PLAINTIFF THOMPSON** for asking for clean water by refusing to provide **PLAINTIFF THOMPSON** with water and by pantomiming drinking water from Defendant's water bottle, mocking **PLAINTIFF THOMPSON** for expressing that he was thirsty.

169.    Thereafter, **CUNY DEFENDANT FREDERICK, CUNY DEFENDANT CLARKE, CUNY DEFENDANT DOES #1 – 5**, and **NYPD DEFENDANT DOES #1 - 20** provided false

information likely to prejudice a finder of fact against **PLAINTIFF THOMPSON** to the New York County District Attorney's Office and induced the criminal prosecution against him.

170.    This information included falsely stating that **PLAINTIFF THOMPSON** had been asked to leave campus and/or been informed that **PLAINTIFF THOMPSON** was not lawfully present prior to his arrest.

171.    It also included the CUNY building property being falsely trashed and staged by **CUNY DEFENDANT FREDERICK** and **CUNY DEFENDANT CLARKE** to falsely attribute property damage to Plaintiffs.

172.    At approximately 11:00 PM on May 1, 2024, **NYPD DEFENDANT DOES #18 - 22** transported **PLAINTIFF THOMPSON** to Manhattan Criminal Court at 100 Centre St.

173.    **PLAINTIFF THOMPSON** remained in NYPD custody until he was arraigned at approximately 3:00 PM on May 2, 2024, despite his rights under New York State law, including the fact that **PLAINTIFF THOMPSON's** charges qualified him for a mandatory Desk Appearance Ticket in lieu of custodial arrest pursuant to CPL § 150.20.

174.    **NYPD DEFENDANTS** and **CUNY DEFENDANTS** permanently and wrongly deprived **PLAINTIFF THOMPSON** of property, including, *inter alia*, a MacBook Pro, headphones, and iPhone 12 Pro Max, medical supplies, and clothing, which were confiscated at the time of his arrest at CCNY.

175.    Defendants forced **PLAINTIFF THOMPSON** to expend costs, including $300 for a locksmith, and additional costs to replace his property.

176.    When **PLAINTIFF THOMPSON** later returned to campus to retrieve his laptop after completing the course for his criminal case, he was told at CCNY by **CUNY DEFENDANT DOE #6** that this **DEFENDANT DOE # 6** had destroyed **PLAINTIFF THOMPSON's** laptop.

177.    **CUNY DEFENDANT DOE #6** informed Plaintiff Thompson that this Defendant had dumped all of the laptops into an alleyway and destroyed them.

178.    Thereafter, in retaliation for the content of Plaintiff Thompson's speech and/or in order to chill future speech by Plaintiff Thompson, **NYPD DEFENDANT DOES #23 - 27**, under the supervision of DCPI Commissioner Kaz Daughtry, released personal information, including Plaintiff Thompson's address, date of birth, and other sensitive information, to members of the media. This conduct chilled **PLAINTIFF THOMPSON's** exercise of his free speech, including by making **PLAINTIFF** fearful of and disincentivized to engage in future protest speech that she otherwise would have engaged in, and fearful of having a public online presence or engaging in public online speech due to the doxing.

179.    The criminal matter against **PLAINTIFF THOMPSON** terminated in his favor when it terminated with an Adjournment in Contemplation of Dismissal (ACD) on July 25, 2024. At no time did any Defendants protect **PLAINTIFF THOMPSON**, mitigate the risks posed to him, or intervene in their fellow Defendants' deficient conduct towards him.

180.    The legal provision governing **PLAINTIFF THOMPSON'S** ACD CPL 170.55, states that, "Upon the dismissal of the accusatory instrument pursuant to this section, the arrest and prosecution shall be deemed a nullity and the defendant shall be restored, in contemplation of law, to the status he occupied before his arrest and prosecution."

181.    The criminal case against **PLAINTIFF THOMPSON** was thereafter dismissed and sealed.

182.    Defendants' conduct caused **PLAINTIFF THOMPSON** to suffer ongoing wrist pain and issues following the overly tight handcuffs of the arrest. He has prominent clicking in his left and right wrists.

183.    As a result of Defendants' conduct, **PLAINTIFF THOMPSON** experienced physical pain and suffering, bruising, swelling, lacerations and reduced range of motions to his wrists, shoulders, and hands, deprivation of liberty, emotional anguish, post-traumatic stress, anxiety, fear, lost income, and additional damages.

184.    The full extent of **PLAINTIFF THOMPSON's** injuries are not yet known, and their effects are ongoing.

### *Plaintiff Sara Bellusci*

185.    **PLAINTIFF SARA BELLUSCI** was a CUNY student present at CCNY.

186.    On April 30, 2024, **PLAINTIFF BELLUSCI** was attending the peaceful and lawful demonstration in support of Palestinian rights.

187.    As part of this protest, **PLAINTIFF BELLUSCI** was participating in a sit-in in one of the buildings on campus.

188.    Without warning, at approximately 8:00 PM, CUNY and NYPD defendants suddenly locked campus gates and otherwise blocked **PLAINTIFF BELLUSCI**'s paths of egress from campus.

189.    Defendants surrounded **PLAINTIFF BELLUSCI** and other demonstrators present at CCNY, closing in and creating a kettle trapping Plaintiff in the building.

190.    This kettle prevented **PLAINTIFF BELLUSCI** from leaving.

191.    It further caused **PLAINTIFF BELLUSCI** fear and anxiety.

192.    **PLAINTIFF BELLUSCI** did not hear any NYPD or CUNY Public Safety instructions to disperse.

193.    While **PLAINTIFF BELLUSCI** was in the building, without warning, in collaboration with **CUNY DEFENDANT YACCARINO** and other CUNY officers, **NYPD DEFENDANT**

**DOES #18 - 22** and **#33– 35** sprayed pepper spray at Plaintiff and others who had been participating in the sit-in. CUNY Officer Felix Camacho was menacingly wielding a baton like a baseball bat while entering the building.

194.    **PLAINTIFF BELLUSCI** then went to the bathroom in the building to wash her eyes from the pepper spray.

195.    While **PLAINTIFF BELLUSCI** was in the bathroom, a group of approximately seven (7) Defendant NYPD Members, including NYPD Member believed to be **DEFENDANT PAWELL** and six (6) other Defendant Does, **NYPD DEFENDANT DOES #35 - 36**, and **CUNY DEFENDANT DOES #4 - 5**, entered the bathroom.

196.    **DEFENDANT PAWELL** instructed **PLAINTIFF BELLUSCI** to "get on the ground now."

197.    **PLAINTIFF BELLUSCI** complied.

198.    Though **PLAINTIFF BELLUSCI** complied, **DEFENDANT PAWELL** shoved Plaintiff against the ground, striking **PLAINTIFF BELLUSCI's** face and body against the floor and causing her pain and difficulty breathing.

199.    While **DEFENDANT PAWELL** pinned **PLAINTIFF BELLUSCI** to the ground face down in a prone position, **NYPD DEFENDANT DOES #35 - 36**, **CUNY DEFENDANT DOES #4 - 5**, and **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT HARRIS**, and **CUNY DEFENDANT CLARKE,** together and individually, then yanked **PLAINTIFF BELLUSCI** from behind and struck her using batons, using excessive force against Plaintiff, who was following all lawful orders.

200.    These NYPD Defendants, together and individually, used their batons to beat **PLAINTIFF BELLUSCI** as she lay on the ground, striking her right ribs, right leg and buttocks, and right elbow on the bone, causing her severe pain, suffering, and further injuries.

201.    **NYPD DEFENDANT DOES #35 – 36**, together and individually, then applied overly tight handcuffs to **PLAINTIFF BELLUSCI'S** wrists.

202.    The overly tight handcuffs caused pain, bruising, and swelling to **PLAINTIFF BELLUSCI's** wrists, shoulders, and back.

203.    **PLAINTIFF BELLUSCI** repeatedly requested for **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT HARRIS**, and **CUNY DEFENDANT CLARKE** to loosen the overly tight handcuffs due to the pain they were causing, and for **NYPD DEFENDANT DOES #35 - 36** to do the same.

204.    These Defendants refused to do so.

205.    Upon information and believe, Defendants used excessive force against **PLAINTIFF BELLUSCI** with malice because of her pro-Palestinian protest speech. This malice was demonstrated throughout the evening of the arrest by Defendants' malicious and disparaging comment about the protest speech.

206.    **PLAINTIFF BELLUSCI** and others arrested were moved to another area of the CCNY building and required to kneel in a line with others while handcuffed.

207.    While handcuffed and on her knees in the CCNY building, Defendant's conduct caused **PLAINTIFF BELLUSCI** pain from the beating, pain from the tight handcuffs, and pain and discomfort from the lingering pepper spray on her hair and clothes.

208.    **CUNY DEFENDANT MELENDEZ** was among the individuals present when **PLAINTIFF BELLUSCI** was handcuffed on her knees.

209.    While **PLAINTIFF BELLUSCI** was handcuffed and on her knees, **CUNY DEFENDANT FREDERICK** was moving down the line of arrested protesters and taking video of each of their faces on a cell phone with flash.

210.    When arrested protesters asked whether it was **CUNY DEFENDANT FREDERICK**'s personal phone, this Defendant laughed and declined to answer.

211.    At approximately 2:00 AM on May 1, 2024, **NYPD DEFENDANT DOES #36 - 38** forced **PLAINTIFF BELLUSCI** onto an NYPD van.

212.    Defendants seated **PLAINTIFF BELLUSCI** in the front row of the van on the righthand side. Approximately seven other protesters were present on the bus.

213.    In the van, **PLAINTIFF BELLUSCI** repeatedly asked an **NYPD DEFENDANT DOES #36 - 38** to loosen and/or adjust her handcuffs because they were hurting her.

214.    **NYPD DEFENDANT DOES #36 - 38** repeatedly declined to loosen and/or adjust **PLAINTIFF BELLUSCI**'s handcuffs.

215.    **NYPD DEFENDANT DOES #37 - 38** transported **PLAINTIFF BELLUSCI** to 1 Police Plaza (1PP) in New York County.

216.    **PLAINTIFF BELLUSCI** remained in the custody of **NYPD DEFENDANT DOES #37 - 38** while present at 1PP, where she was forced to languish without food, potable water, access to phone calls, access to medical care, access to bathrooms and basic hygiene, and in overcrowded cells.

217.    While **PLAINTIFF BELLUSCI** remained in NYPD custody at 1PP, **NYPD DEFENDANT DOES** failed to loosen her overly-tight handcuffs, despite being on notice that they were overly-tight.

218.    **NYPD DEFENDANTS** further denied **PLAINTIFF BELLUSCI** access to her daily psychiatric medications while in custody, including lamotrigine and sertraline.

219.    These medications induce withdrawal effects when not taken daily.

220.    **PLAINTIFF BELLUSCI** suffered painful and disorienting withdrawal effects of not taking her medically necessary prescriptions while wrongfully detained in Defendants' custody.

221.    **PLAINTIFF BELLUSCI** requested a NYPD Officer for her to be able to access her medications, which were in her backpack and labelled in an original prescription bottle.

222.    **PLAINTIFF BELLUSCI** informed NYPD Officer that she was without medication that she needed for her medical conditions.

223.    **NYPD DEFENDANT DOE #39** informed her that she could not access her medication and did not take any steps to otherwise provide her with medical care.

224.    As a result of being denied her medication while in custody, Defendants caused **PLAINTIFF BELLUSCI** to experience withdrawal from her medications from stopping and restarting the medications, with symptoms including nausea, difficulties with temperature regulation, severe depression, brain fog, and loss of appetite.

225.    While in custody at 1PP, **NYPD OFFICER DOES #37 - 40** mocked and antagonized protesters, including **PLAINTIFF BELLUSCI**, based on their pro-Palestinian speech.

226.    **NYPD DEFENDANT DOE #40**, believed to be a female officer, took one of the protester's keffiyehs, a scarf that is a symbol of pro-Palestinian solidarity that is used by pro-Palestine protesters. **DEFENDANT DOE # 40** wore the scarf, strutting and smirking, walking up and down the hallway while mockingly wearing the garment and antagonizing the detained demonstrators.

227.    When incarcerated, protesters asked why **NYPD DEFENDANT DOE #40** was disrespectfully wearing this garment that did not belong to her. She replied, in sum and substance, "Because I can," emphasizing Defendants' ability to act with impunity when mistreating protesters for their pro-Palestinian speech.

228.    **CUNY DEFENDANT KEISHA FREDERICK**, **CUNY DEFENDANT CLARKE**, and **NYPD Defendant Does #1 - 20** provided false information likely to prejudice a finder of fact against Plaintiff to the New York County District Attorney's Office and induced the criminal prosecution against her.

229.    Defendants falsely provided information stating that **PLAINTIFF BELLUSCI** had been asked to leave campus or warned prior to her arrest.

230.    This information included the false allegation that **PLAINTIFFS** had vandalized the CUNY building property that was falsely trashed and staged by **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE**, and other CUNY officers to falsely attribute property damage to protesters.

231.    During her detention by **DEFENDANT NYPD MEMBERS**, **PLAINTIFF BELLUSCI** observed an NYPD sign that indicated individuals should not be held longer than 24 hours, and to tell NYPD personnel if that was the case.

232.    **PLAINTIFF BELLUSCI** referenced the sign to **NYPD DEFENDANT DOE #41**, a white or Latina guard with highlights in her hair, which was in a ponytail. **NYPD DEFENDANT DOE #41** looked at **PLAINTIFF BELLUSCI** and stated, in sum and substance, "It literally doesn't matter."

233.    After being moved to Central Booking downstairs, **PLAINTIFF BELLUSCI** and others still had not received a phone call.

234.    **PLAINTIFF BELLUSCI** requested to make a phone call and **NYPD DEFENDANT DOE #42**, who appeared to be a Black woman, pointed to the phone on the wall, said, in sum and in substance, "People in here kept wanting to break it, and the City won't replace it, so you guys don't get your phone call."

235.    **PLAINTIFF BELLUSCI** never received a phone call while in custody.

236.    At approximately 11:00 PM on May 1, 2024, **NYPD DEFENDANT DOES #18 - #22** transported **PLAINTIFF BELLUSCI** to Manhattan Criminal Court at 100 Centre St.

237.    **PLAINTIFF BELLUSCI** remained in NYPD custody until she was arraigned at approximately 3:00 PM on May 2, 2024, despite her rights under New York State law, including the fact that **PLAINTIFF BELLUSCI**'s charges qualified her for a mandatory Desk Appearance Ticket in lieu of custodial arrest pursuant to CPL § 150.20.

238.    After her release, **PLAINTIFF BELLUSCI** sought medical care at urgent care for her injured elbow. She was diagnosed with a bone bruise from the baton. Plaintiff Bellusci also wore the brace to restrict movement in her elbow for about a month.

239.    **PLAINTIFF BELLUSCI** experienced pain in her elbow for over six months following the incident due to the excessive force.

240.    **PLAINTIFF BELLUSCI** was permanently and wrongly deprived by Defendants pursuant to her arrest of her property and valuables, including, *inter alia*, her phone and portable power bank.

241.    Thereafter, in retaliation for the content of **PLAINTIFF BELLUSCI's** speech, and/or in order to chill future speech by **PLAINTIFF BELLUSCI, NYPD DEFENDANT DOES #23 - 27**, under the supervision of Defendant DCPI Commissioner Kaz Daughtry, released personal information, including Plaintiff Bellusci's address, date of birth, and other sensitive information, to

members of the media. This conduct chilled **PLAINTIFF BELLUSCI**'s exercise of her free speech, including by making **PLAINTIFF** fearful of and disincentivized to engage in future protest speech that she otherwise would have engaged in, and fearful of having a public online presence or engaging in public online speech due to the doxing.

242. The criminal matter against **PLAINTIFF BELLUSCI** terminated in her favor when it was dismissed in its entirety on June 12, 2024.

243. At no time did any Defendants protect **PLAINTIFF BELLUSCI**, mitigate the risks posed to her, or intervene in their fellow Defendants' deficient conduct towards her.

244. At no time did **PLAINTIFF BELLUSCI** refuse to comply with lawful commands, pose a risk to the safety of **DEFENDANTS** or others, or attempt to flee custody.

245. **DEFENDANTS** possessed no warrant for the arrest of **PLAINTIFF BELLUSCI**.

246. Defendants' conduct caused **PLAINTIFF BELLUSCI** to experience physical pain and suffering, bruising, swelling, lacerations and reduced range of motions to her wrist, shoulder, and hand.

247. Defendants' conduct caused **PLAINTIFF BELLUSCI** to experience actual chilling, including fear about participating in future pro-Palestine protest or speech that affected her future speech.

248. Defendants' conduct caused **PLAINTIFF BELLUSCI** to suffer anxiety and depression.

249. Defendants' conduct caused **PLAINTIFF BELLUSCI** to suffer brain fog, fatigue, headaches, and loss of appetite.

250. Defendants' conduct caused **PLAINTIFF BELLUSCI** to develop intense agoraphobia due to fears for her safety in public and leaving or entering her home.

251.    Defendants' conduct caused **PLAINTIFF BELLUSCI** to suffer the deprivation of liberty, emotional anguish, post-traumatic stress, lost income, and additional damages.

252.     The full extent of **PLAINTIFF BELLUSCI**'s injuries are not yet known, and their effects are ongoing.

### *Plaintiff Patricia Chou*

253.    On April 30, 2024, **PLAINTIFF PATRICIA CHOU** was attending the demonstration in support of Palestinian rights on CCNY's campus.

254.    **PLAINTIFF CHOU** did not enter any CUNY buildings during this time period.

255.    Without warning, at approximately 8:00 PM, CUNY and NYPD Defendants suddenly locked campus gates and otherwise blocked **PLAINTIFF CHOU**'s paths of egress from campus.

256.    **DEFENDANTS** provided no actionable lawful warning to **PLAINTIFFS** to disperse prior to this action.

257.    One Latina officer who wore her hair in a bun, **CUNY DEFENDANT DOE #1**, detained **PLAINTIFFS CHOU** and **ATAHUALPA** on campus. **CUNY DEFENDANT DOE #1** summoned over four other CUNY officers.

258.    Two of these men, **CUNY DEFENDANT DOES #2** and **#3**, then yanked **PLAINTIFF CHOU** from behind and applied overly tight handcuffs to **PLAINTIFF CHOU'S** wrists.

259.    The overly tight handcuffs caused pain, bruising, and swelling to **PLAINTIFF CHOU's** wrists, shoulders, and back.

260.    **CUNY DEFENDANT DOES #2** and **#3**, then forced **PLAINTIFF CHOU** into a CUNY building on the CCNY campus and forced **PLAINTIFF CHOU** to remain there for approximately five hours while handcuffed and in detention.

261.    While in the building, **CUNY DEFENDANT DOES #2** and **#3 and NYPD DEFENDANT DOES #1 and #2** repeatedly stated to detained protesters, "You hate America, right?"

262.    **CUNY DEFENDANT DOE #4**, a woman, heatedly accused protesters, including Plaintiff Chou, of supporting Hamas.

263.    **CUNY DEFENDANT TAISH ROCHESTER**, and **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT HARRIS**, and **CUNY DEFENDANT CLARKE** led **PLAINTIFF CHOU** out of the building around 11:00 PM and lined her up with others on Amsterdam Avenue. It took several hours to be loaded into the bus.

264.    At approximately 11:30 PM on the night of April 30, 2024, to 12:30 AM on May 1, 2024, NYPD and CUNY Defendants, including **CUNY DEFENDANT TAISH ROCHESTER**, and **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT HARRIS**, and **CUNY DEFENDANT CLARKE** forced Plaintiff Chou onto a MTA bus.

265.    **CUNY DEFENDANT FREDERICK** was assigned to guard **PLAINTIFF CHOU** while present on the bus.

266.    Other CUNY officers, including **CUNY DEFENDANT FREDERICK**, Officer Felix Camacho, Officer Danual Yaccarino, Officer Walter Nkrumah, and **CUNY DEFENDANT CLARKE** accompanied Plaintiffs to 1PP.

267.    NYPD and CUNY Defendants transported Plaintiff Chou to 1 Police Plaza (1PP) in New York County.

268.    NYPD and CUNY Defendants forced Plaintiff Chou to remain on the bus for approximately four (4) hours before permitting Plaintiff to enter 1PP.

269.    In total, **PLAINTIFF CHOU** was in overly-tight handcuffs, which were never loosened, for approximately nine (9) hours, from approximately 9:00 PM until she was placed in a cell at 1PP at around 6am.

270.    Upon information and believe, Defendants used excessive force against **PLAINTIFF CHOU** with malice because of her pro-Palestinian protest speech. This malice was demonstrated throughout the evening of the arrest by Defendants' malicious and disparaging comment about the protest speech.

271.    **PLAINTIFF CHOU** remained in the custody of **NYPD DEFENDANT DOES #1 – 5** and CUNY officers while present at 1PP, where she was forced to languish without food, potable water, access to phone calls, access to bathrooms and basic hygiene, and in overcrowded cells.

272.    While in custody, **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT HARRIS**, **CUNY DEFENDANT CLARKE**, and **NYPD MEMBER DOES** and others, verbally degraded **PLAINTIFF CHOU** and others for their protest speech. Defendants called Plaintiff Chou and others stupid, naive, and made hateful statements about Palestinians.

273.    Dozens of **DEFENDANT CITY's NYPD MEMBERS** present for the unlawful arrest and detention of **PLAINTIFF CHOU**. These NYPD members declined to intervene on **PLAINTIFF CHOU's** behalf despite possessing the notice, duty, and opportunity to do so.

274.    **PLAINTIFF CHOU** was held and handcuffed in an uncomfortable position that contorted her back, causing her back pain that persisted.

275.    **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE**, **CUNY DEFENDANT DOES #1 – 5**, and **NYPD DEFENDANT DOES #1 - 20** provided false information likely to prejudice a finder of fact against Plaintiff Chou to the New York County District Attorney's Office and induced the criminal prosecution against her.

276.     **DEFENDANT TAISH ROCHESTER**'s signed felony criminal complaint stated that she, "observed the above-listed defendants inside of . . .a City College of New York campus building, without permission and authority."

277.     Defendants further accused **PLAINTIFF CHOU** in this complaint of "blocking doors with furniture" and "throwing items at responding officers."

278.     All of this was a lie, and **DEFENDANT TAISH ROCHESTER** was on notice this was a lie, because **PLAINTIFF CHOU** never entered any CUNY buildings that evening, let alone engaged in any of the other conduct she was falsely accused of.

279.     Defendants provided false information stating that **PLAINTIFF CHOU** had been provided with notice and opportunity to comply with lawful orders to vacate campus prior to her arrest.

280.     It also included the CUNY building property being falsely trashed and staged by **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE**, and other CUNY officers to falsely attribute property damage to protesters.

281.     At approximately 11:00 PM on May 1, 2024, **NYPD DEFENDANT DOES #18 - #22** transported **PLAINTIFF CHOU** to Manhattan Criminal Court at 100 Centre St.

282.     **PLAINTIFF CHOU** remained in NYPD custody until she was arraigned at approximately 3:00 PM on May 2, 2024, despite her rights under New York State law, including the fact that **PLAINTIFF CHOU'S** charges qualified her for a mandatory Desk Appearance Ticket in lieu of custodial arrest pursuant to CPL § 150.20.

283.     **PLAINTIFF CHOU** was permanently and wrongly deprived by Defendants pursuant to her arrest of at least $20 cash, a backpack, and other property totaling approximately $800 in value.

284.    Thereafter, in retaliation for the content of v **PLAINTIFF CHOU's** speech, and/or in order to chill future speech by **PLAINTIFF CHOU**, **NYPD DEFENDANT DOES #23 - 27**, under the supervision of Defendant DCPI Commissioner Kaz Daughtry, released personal information, including Plaintiff Chou's address, date of birth, and other sensitive information, to members of the media. This conduct chilled Plaintiff Chou's exercise of her free speech.

285.    The criminal matter against **PLAINTIFF CHOU** terminated in her favor when it terminated with an Adjournment in Contemplation of Dismissal (ACD) on July 25, 2024.

286.    At no time did any Defendants protect **PLAINTIFF CHOU** or mitigate the harms posed to her or intervene in their fellow Defendants' deficient conduct towards her.

287.    At no time did **PLAINTIFF CHOU** refuse to comply with lawful commands, pose a risk to the safety of **DEFENDANTS** or others, or attempt to flee custody.

288.    **DEFENDANTS** possessed no warrant or probable cause for the arrest of **PLAINTIFF CHOU**.

289.    Despite none of **PLAINTIFF CHOU'S** speech or protest including antisemitism, because **PLAINTIFF CHOU** is not antisemitic, as a condition of receiving her ACD, she was required to take a course on antisemitism.

290.    Upon information and belief, this ACD condition was imposed because Defendants falsely characterized pro-Palestinian speech as antisemitic.

291.    **PLAINTIFF CHOU'S** speech was non-violent and non-discriminatory.

292.    This condition indicates content-based punishment of speech critical of Israel or supportive of Palestinians.

293.    The legal provision governing **PLAINTIFF CHOU'S** ACD, CPL 170.55, states that, "Upon the dismissal of the accusatory instrument pursuant to this section, the arrest and

prosecution shall be deemed a nullity and the defendant shall be restored, in contemplation of law, to the status [s]he occupied before his arrest and prosecution."

294.    The criminal case against **PLAINTIFF CHOU** was thereafter dismissed and sealed.

295.    **PLAINTIFF CHOU** repeatedly attempted to recover her property, but these attempts were rejected by **DEFENDANTS**.

296.    As a result of Defendants' conduct, **PLAINTIFF CHOU**, a professional plumber, lost a plumbing job placement at LaGuardia Airport and lost work and income.

297.    Additionally, **PLAINTIFF CHOU** lost at least two weeks of work due to other aspects of the case, including time in custody, court appearances, and time dealing with back injuries from the arrest.

298.    Because of **PLAINTIFF CHOU'S** criminal case, she lost a Security Clearance at her job, resulting in a significant decrease in her wages.

299.    **PLAINTIFF CHOU** sought medical care for her back injury due to the ongoing lower back pain.

300.    The back pain caused trouble sleeping due to the pain and made walking and working painful. This pain lasted for over six (6) months, and the trouble sleeping also lasted this whole time.

301.    Defendants' conduct caused **PLAINTIFF CHOU** to experience nightmares for months following the arrest.

302.    Defendants' conduct caused **PLAINTIFF CHOU** lost her appetite and lost weight as a result of the stress and anxiety.

303.    Defendants' conduct caused **PLAINTIFF CHOU** also sought mental health treatment due to Defendants' actions.

304.    Defendants' conduct caused **PLAINTIFF CHOU** to experience physical pain and suffering, bruising, swelling, lacerations and reduced range of motions to her wrists, shoulders, and hands, ongoing back pain, deprivation of liberty, emotional anguish, post-traumatic stress, anxiety, fear, lost income, and additional damages.

305.    The full extent of **PLAINTIFF CHOU'S** injuries are not yet known, and their effects are ongoing.

### PRESS CONFERENCE

306.    In a press conference on May 1, 2024, **DEFENDANT ADAMS** and other policymakers of **DEFENDANT CITY**, including NYPD Commissioner Edward Caban, NYPD Deputy Commissioner of Public Information Tarik Sheppard, NYPD Chief of Patrol John Chell, NYPD Deputy Commissioner of Intelligence and Counterterrorism Rebecca Weiner, NYPD Deputy Commissioner Kaz Daughtry, and NYPD Chief of Department Jeffrey Maddrey participated in a press conference about the police response to protests at CCNY and Columbia. **Exhibit 2**.

307.    This press conference confirmed that Defendant City's strategy for the night of Plaintiffs' arrests, and Plaintiffs' treatment, was reviewed, overseen, and approved by the highest levels of NYPD and City policymakers.

308.    It also established **DEFENDANT ADAMS'** active involvement and role in actively supervising the **NYPD DEFENDANTS'** treatment of **PLAINTIFFS**.

309.    As part of **DEFENDANT ADAMS'** statements, he stated, "I just really want to thank Commissioner Weiner. She was the one that was monitoring the situation when I first started seeing the protests take place in the city. It just did not fit right."

310.    The press conference also demonstrated viewpoint-specific animus to the pro-Palestine nature of the protests.

311.    **DEFENDANT ADAMS** continued, "There is a movement to radicalize young people, and I'm not going to wait until it's done and all of a sudden acknowledge the existence of it. This is a global problem that young people are being influenced by those who are professionals at radicalizing our children, and I'm not going to allow that to happen as the mayor of the City of New York."

312.    **DEFENDANT ADAMS** emphasized his commitment to stopping this "movement to radicalize young people," referencing the pro-Palestine speech and protest on campuses.

313.    **DEFENDANT ADAMS** continued to state that, "Approximately 300 people were arrested at Columbia and City College were processing the arrests to distinguish between who were actual students and who were not supposed to be on the ground. We pointed out yesterday, these external actors with a history of escalating situations and trying to create chaos. Not to peacefully protest, but create chaos. If you were at City College and you saw the bottles, the garbage cans, the other items that were thrown at police officers, those police officers showed a great level of discipline to not allow this to evolve to an out-of-control situation. As we pointed out yesterday, they are attempting to disrupt our city, and we are not going to permit it to happen. We're proud to say they have been removed from the campus. The NYPD's precision policing ensured that the operation was organized, calm, and that there were no injuries or violent clashes."

314.    **DEFENDANT ADAMS** further stated that the police response to CCNY was official city policy, noting, "We didn't wake up and execute[] a plan. This is a plan that has been put in place since January 2022, when we understood our Police Department had to be prepared for uncertainties like this."

315.    **DEFENDANT ADAMS** continued, "This is not a celebratory moment. We should never have had to have to get here in the first place. We can't create environments while children can be

in danger, and we must push back on all attempts to radicalize our young people in this city like we're seeing across the entire globe."

316.    **DEFENDANT ADAMS** also praised the NYPD members who posted a video of themselves removing a Palestinian flag at the site of the protest and replacing it with the American flag, noting, "That's our flag folks," and "You don't take over our buildings and put another flag up." The mayor added, "It's despicable that schools will allow another country's flag to fly in our country. So blame me for being proud to be an American. We're not surrendering our way of life to anyone."

317.    **DEFENDANT ADAMS** stated, "It's despicable that schools will allow another country's flag in our country" in reference to the Palestinian flag that had been raised on CCNY's campus.

318.    This position on "another country's flag" was in sharp contrast to Adam's repeated comments about Israel's flag in a flag-raising ceremony a year prior, where he commented, "I am looking forward to raising this flag to show the solidarity that New York City has with the people of Israel. Let's continue to uplift each other, let's continue to stand for what is right and let's continue to raise the flag in solidarity with Israel." **Exhibit 3.**

319.    When posting the video of the action, in which NYPD replaced a Palestinian flag raised in protest with the American flag, Kaz Daughtry stated, "An incredible scene and proud moment as we have assisted City College NY in restoring order on campus, culminating in raising Old Glory once again on their campus flagpole." **Exhibit 4.**

320.    Chief Maddrey stated, "We had to pivot because City College got violent."

321.    In a press release on May 2, 2024, stated, "Mayor Adams, NYPD Commissioner Caban Provide Additional Details Highlighting Nearly 50 Percent of Columbia/City College Protests Included Unaffiliated Parties."

322.     In the press release, **DEFENDANT MAYOR ADAMS** was quoted as saying, "The world is watching New York City, and our message to them has been clear: We will not be a city of lawlessness, and we will not allow our youth to be influenced by those who have no goal other than spreading hate and wreaking havoc on our city," said **DEFENDANT ADAMS**. "As the anti-Israel protests began to escalate, it became abundantly clear that individuals unaffiliated with these schools had entered these different campuses and, in some cases, were even training students in unlawful protest tactics, many which we witnessed escalating into violent conduct. What is now even clearer is the extent to which outsiders were actually present. Nearly half of those arrested at Columbia and City College were not affiliated with these schools. Free speech and peaceful protest remain the fabric of our society, but that is not what we have been witnessing on these campuses. There is nothing peaceful about barricading buildings, destroying property, dismantling security cameras, or calling for the destruction of an entire people, and we will not allow what should be peaceful gatherings to turn into violent spectacles."

323.     **DEFENDANT ADAMS** and NYPD Defendants at the press conference amplified the false evidence created by NYPD and CUNY officers at the scene, falsely characterizing protesters like Plaintiff as violent, outside agitators, and "professionals radicalizing our children."

324.     Comments at this press conference also establish that **DEFENDANT ADAMS** and NYPD defendants were specifically hostile to the pro-Palestinian protest speech underlying the protests.

### *Post-Arrest*

325.     The NYPD's press office, believed to be led at the time by high-ranking NYPD officials Deputy Commissioner Tarik Sheppard and Deputy Commissioner Kaz Daughtry, released Plaintiffs' information to the media that included their names, date of birth, address, and arrest charges.

326.    Deputy Commissioner Tarik Sheppard and Deputy Commissioner Kaz Daughtry in their roles are tasked with speaking on behalf of the City's NYPD and were working in their capacity as employees and/or agents of the City when they released Plaintiffs' addresses and other personal information.

327.    This information was published in the *Jewish Voice* online, including all of this information in full, including Plaintiffs' home addresses. **Exhibit 5**.

328.    This release characterized Plaintiffs as "pro-Hamas protesters."

329.    As a result of their home addresses and information being public, Plaintiffs experienced serious concern for their safety and the safety of others who lives in their homes due to this violation of their privacy.

330.    This information is still online to this day, despite criminal charges against all Plaintiffs being resolved in their favor.

331.    Two days after Plaintiffs' arrests, on May 1, 2024, and May 2, 2024, NYPD Chief of Patrol John Chell appeared on the far-right media outlet Newsmax, in his official NYPD capacity, to validate the NYPD's violent crackdown on pro-Palestine demonstrators on college campuses. Chell further opined that "outside agitators" were leading the campus movements and to further call for the expulsion of pro-Palestine students and the firing of supportive faculty from these institutions.[3]

### CUNY'S TARGETING OF PRO-PALESTINIAN SPEECH

332.    The excessive force, First Amendment retaliation, and Equal Protection violations by CUNY public safety officers against Plaintiffs take place in the larger context of CUNY, including

CUNY public safety officers, retaliating against and punishing pro-Palestinian speech and speech by those of Palestinian origin.

333.    CUNY, and CUNY public safety, has a per se policy of targeting the speech of those of Palestinian national origin, and those associated with Palestinians for discipline, violence, and police intervention.

334.    A complaint from Muslim Advocates outlines this pattern at CUNY, which documents content and identity-based discrimination by CUNY administration including "selective removal of student fliers supporting Palestinian lives."

335.    This complaint outlines how pro-Palestinian speech is treated different from its comparators, including pro-Israeli speech, where, "that CUNY Law. . . .refused to take any action when the right-wing attack group Accuracy in Media brought its infamous doxxing truck to CUNY Law and its affiliates verbally and physically harassed students." Muslim Advocates, *CUNY Students File Federal Civil Rights Complaint About Anti-Palestinian Racism*, April 16, 2024, https://muslimadvocates.org/2024/04/muslim-advocates-cuny-students-file-federal-civil-rights-complaint-about-anti-palestinian-racism/.

336.    CUNY students have also repeatedly faced discipline for pro-Palestinian speech that is not in any way discriminatory. Luca Goldmansour, *CUNY Is Investigating Student Government Leaders for Boycotting Israel*, Feb. 13, 2025, https://www.thenation.com/article/activism/cuny-title-vi-investigation-palestine-student-government-boycott-israel/.

337.    Recently, four CUNY professors were terminated from CUNY apparently for their pro-Palestine protest speech. Sanya Mansoor, *Four CUNY Professors Say They were Fired for Supporting Palestine*, July 15, 2025, https://theintercept.com/2025/07/15/cuny-professors-fired-palestine/.

338.    Upon information and belief, CUNY has not disciplined any pro-Israel student speech, including speech that is in fact discriminatory, including speech that condones the mass killing of civilian Palestinians, Islamophobic speech, and speech that discriminatorily dehumanizes Palestinians or Arabs and characterizes them as barbaric.

339.    Upon information and belief, CUNY public safety has not used excessive force against protesters who are not associated with protesters of a Palestinian nationality.

340.    As a comparator, CUNY public safety has no record of using excessive force against protesters who are associated with those of an Israeli nationality.

341.    Here, the excessive force used against Plaintiffs was in part due to their association with protesters of Palestinian national or ethnic origin.

342.    For example, the night of the protest, CUNY Public Safety Defendants, including those who had been involved in excessive force against protesters, targeted a Palestinian protester and mocked her for her Palestinian ethnicity.

343.    These Defendants included **CUNY DEFENDANT KEISHA FREDERICK, CUNY DEFENDANT KHALID CLARKE**, and **CUNY DEFENDANT DOE #6**.

344.    Upon information and belief, these comments outlined underlying animus on the basis of association with Palestinian protesters, and on the basis of pro-Palestinian speech, motivated CUNY Defendants' mistreatment, harassment, and excessive force against Plaintiffs.

345.    Concurrently with these statements demonstrating animus from CUNY Defendants, **CUNY DEFENDANT FREDERICK**, **CUNY DEFENDANT CLARKE**, and other CUNY officers were intentionally breaking glass, throwing items around the room to intentionally make it look destroyed, and chipping away at items in the room to break them, deliberately fabricating evidence against Plaintiffs.

346.    When this individual noted that the officers were picking items up and planting them on her, these Defendants laughed and continued to fabricate evidence.

347.    Defendants deliberately fabricated this evidence against the protesters including Plaintiff because of their pro-Palestinian speech, and because Plaintiffs associated with those of Palestinian national origin.

348.    Plaintiffs now bring the following Claims before this Court.

## FIRST CLAIM FOR RELIEF

### Failure to Train and/or Supervise (*Monell* Liability)
*Against Defendant City Pursuant to 42 U.S.C. § 1983 and*
*Monell v. Department of Social Services (436 U.S. 658 [1978]) for Defendants'*
*Violations of Plaintiffs's Rights Under the First, Fourth, Fifth, and Fourteenth*
*Amendments to the United States Constitution*

349.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

350.    **DEFENDANT CITY**, through its policymakers including **DEFENDANT MAYOR ERIC ADAMS**, NYPD Commissioner Edward A. Caban, NYPD Deputy Commissioner of Public Information Tarik Sheppard, NYPD Chief of Department Jeffrey Maddrey, NYPD Chief of Patrol John Chell, NYPD Deputy Commissioner of Operations Kaz Daughtry, NYPD Deputy Commissioner of Intelligence and Counterterrorism Rebecca Weiner, and NYPD Chief of Special Operations Wilson Aramboles were responsible for implementing and enforcing policies and procedures on behalf of the **DEFENDANT CITY**.

351.    In addition to Defendant City's *Monell* liability for claims hereinafter stated, including for engaging in excessive force and First Amendment violations, **DEFENDANT CITY** is liable for failing to train and failing to supervise its NYPD members concerning viewpoint-neutral and

constitutionally sound responses to demonstrations in New York City, and for failing to discipline officers who fail to adhere to constitutionally sound standards.

    a.   The facts pleaded above describe the policies, practices, and customs Defendants subjected the Plaintiff to, including, but not limited to:

        i.   Excessive uses of force at protests and/or demonstrations;

        ii.   Content-specific enforcement of demonstrations and/or protests;

        iii.   Fabrication of evidence against protesters;

        iv.   Making allegations against individuals who engage in protests and/or demonstrations that are in support of Palestinian rights; and

        v.   A practice of the NYPD's press team of releasing the names and home addresses of pro-Palestinian and other "leftist" protesters in custody to journalists, while failing to release the same information of similarly-situated arrestees, including pro-Israel protesters upon their arrest.

    b.   All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to:

        i.   Formal policies, rules, and procedures of Defendant City;

        ii.   Actions and decisions by Defendant City's policymaking agents; and

        iii.   Customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant Mayor Eric Adams, NYPD Commissioner Edward A. Caban, NYPD Deputy Commissioner of Public Information Tarik Sheppard, NYPD Chief of Department Jeffrey Maddrey, NYPD Chief of Patrol John Chell, NYPD Deputy Commissioner

of Operations Kaz Daughtry, NYPD Deputy Commissioner Of Intelligence and Counterterrorism Rebecca Weiner, and NYPD Chief of Special Operations Wilson Aramboles, and other policymaking officials.

### History of NYPD's Failure to Train

352.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

353.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

354.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

355.    Upon information and belief, to this day, that document forms the core of the NYPD protest response-related training.

356.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "proactive" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

357.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

358.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

359.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

360.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

361.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

362.    Defendants' failures to train, which contributed to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

a.   The failure to provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.   The failure to make clear the need for individualized probable cause to arrest in a protest context;

c.   The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies; and

d.  The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters.

***History of the NYPD's Failure to Monitor and Supervise Protest Responses***

363.    Although Defendants City, by its agents and/or policymakers, had actual knowledge that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

364.    Indeed, despite these Defendants' presence at these demonstrations and their participation in the rampant police violence exacted there, and despite the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been disciplined related to their conduct, and no NYPD members have been meaningfully disciplined related to their conduct.[4]

365.    Defendant City and its policymaker Defendants failed to train and supervise the Defendant NYPD members.

366.    All individual Defendants were employees and/or agents of Defendant City and were acting within the scope of their employment at the time of the conduct giving rise to Plaintiffs' injuries.

367.    Defendants knew or should have known that Defendant NYPD Members were likely to violate the constitutional rights of individuals in their custody.

---

[4] Yoav Gonen, *Almost Every NYPD Cop Charged with Excessive Force During the George Floyd Protests Escaped Serious Punishment*, The City (June 3, 2025), https://www.thecity.nyc/2025/06/03/nypd-excessive-force-discipline-george-floyd-protests/.

368.    Defendants know that NYPD Members are certain to regularly encounter circumstances described herein, including interacting with demonstrators and/or engaging in protest-related enforcement.

369.    Defendants knew that there is a history of wrongful conduct in these scenarios by NYPD Members.

370.    Defendants further knew that training and/or supervision could ameliorate the potential harms of constitutional violations in these scenarios, including civil rights violations and physical and emotional injuries.

371.    Nevertheless, Defendants failed to train its agents and/or employees regarding their conduct during the scenarios described herein and further failed to supervise its agents and/or employees when engaged in high-risk contact.

372.    By failing to train and supervise Defendant NYPD Members, these Defendants exhibited a conscious disregard and/or deliberate indifference for the risks posed by NYPD members' conduct absent adequate training and supervision.

373.    The NYPD not only has a history of using excessive force against protesters, but also it has a track record of treating pro-Palestine and its pro-Israel protester comparators differently.

374.    This disparate treatment extends not just to who the NYPD chooses to arrest, but also to other non-arrest disparate treatment.

375.    For pro-Palestine protesters, the NYPD uses excessive force and kettling to prevent protesters from dispersing in lieu of arrest.

376.    It does not do the same for pro-Israel protesters, even when their conduct breaks the law, is violent, or is explicitly hateful.

377.    Video footage the same month of this case at a pro-Palestine protest shows NYPD officers "repeatedly punching men lying prone on the ground." **Exhibit 6**.

378.    CNN noted that, "Footage shot by bystanders and independent journalists shows police officers intercepting a march in the street, shoving participants toward the sidewalk, and then grabbing some people in the crowd and dragging them down to the asphalt. Officers can be seen repeatedly punching at least three protesters, in separate incidents, as they lay pinned on the ground."

379.    In response to the footage, **DEFENDANT ADAMS** and NYPD Deputy Commissioner Kaz Daughtry defended this use of excessive force against pro-Palestinian protesters.

380.    **DEFENDANT ADAMS** stated, "I take my hat off to the Police Department, how they handled an unruly group of people."

381.    NYPD Deputy Commissioner Kaz Daughtry also was supportive of these actions by the NYPD, stating, "We will not accept the narrative that persons arrested were victims, nor are we going to allow illegal behavior."

382.    An analysis of protest arrests from the time period of this case also reveals that the NYPD further selectively releases the names and arrest charges of protesters based on the viewpoint of the protesters.

383.    For example, just a month after the events of this case, a pro-Israel agitator intentionally hit two individuals at pro-Palestine protest with her car. Although the NYPD took the agitator into custody, they declined to release the name of the agitator, let alone their address, to the press, in sharp contrast to the pro-Palestine protesters in this case. **Exhibit 7**.

384.    In another example, a large police presence showed up in response to a pro-Palestine protest in response to a visit of Israeli National Security Minister Itamar Ben Gvir at the Chabad-Lubavitch World Headquarters in Crown Heights, Brooklyn. **Exhibit 8**.

385.    That large police presence however did nothing to intervene when a woman was mistaken as a pro-Palestinian protestor by pro-Israel counter protesters, and chased by a large group of men yelling "death to Arabs" who threatened to rape her, including someone who threw a traffic cone at her.

386.    The NYPD however only arrested one person and declined to comment on whether the person was related to the incident.

387.    Unlike in this case, the NYPD also did not release the names, arrest charges, or addresses of any pro-Israel protesters who were taken into custody.

388.    Upon information and belief, no pro-Israel protesters, including those who engaged in explicitly hateful or racist conduct, such as saying "death to Arabs," were required to participate in trainings on Islamophobia as a condition of the resolution of a criminal case.

389.    In contrast, when it comes to pro-Palestinian protesters, the NYPD even breaks its own policies to violate the privacy interests of protesters.

390.    In violation of its own Sanctuary City policies, in one instance, the NYPD has shared full name, arrest charges, and date of birth of a Palestinian protester with Immigrations and Customs Enforcement. **Exhibit 9**.

391.    Upon information and belief, the NYPD has not shared the names and arrest charges of any pro-Israel protesters with Immigrations and Customs Enforcement.

***NYPD's History of a Viewpoint-Specific Protest Enforcement Generally***

392.    This disparate, violent treatment of pro-Palestine protesters is consistent with the NYPD's long, well-documented history of viewpoint-specific treatment of protesters, in which it treats left-wing protesters violently and right-wing protesters permissively.

393.    On July 12, 2020, a pro-police "Blue Lives Matter" march was orchestrated in Bay Ridge, Brooklyn.[12] The march was also attended by counter-protestors organized against police brutality.[13] Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested, both of whom were Black men protesting police brutality.[14] By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[15]

394.    The day before, on July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter-protestors' faces.[16] The NYPD made no arrests at the rally.[17]

395.    On October 25, 2020, a group called Jews for Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[19]

396.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[20]

397.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[21],[22]

398.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present. Plaintiff incorporates the following non-comprehensive examples by reference:

   a.   In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

   b.   In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[23],[24]

   c.   More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[25] During this incident three

left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[26]

### NYPD's History of Viewpoint-Specific Excessive Force Against Protesters

399.    The violations suffered here by Plaintiff are at the common intersection of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years.

400.    Following NYPD conduct during protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, sexually abused while demonstrating, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has Plaintiffs in this case.

401.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants and their predecessors, and by other Defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases, which are incorporated by reference:

     a.    *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be

processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,*" No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b. *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1) NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c. *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the

protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d. *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e. *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f. *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other

cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.  *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein);

h.  *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint

and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.  Despite then-Mayor Michael Bloomberg's recognition that "the majority of the [OWS] protesters have been peaceful and responsible,"[5] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.  In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with

---

[5] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[6] encircled them on three sides and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.   Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.   The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.   The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders

---

[6] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

and opportunity to disperse, unnecessary and excessive force used on protesters
and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of
these cases include multiple plaintiffs and were all settled by the City of New York,
including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick
v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-
cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.  Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case,
Peat,* the Union Square Litigations, as well as several other OWS-related cases,
included failure to train *Monell* claims concerning protest activity that are similar
to the *Monell* claims in this litigation;

o.  The incidents discussed in the 2003 NYCLU special report created by the
NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled
*Arresting Protest*, published April 2003, *available at*
https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protes
t.pdf;

p.  The incidents discussed in the 2005 NYCLU special report created by the
NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*,
published in 2005, *available at*
https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_r
nc.pdf;

q.  The incidents discussed in the research compiled by The Global Justice Clinic at
the New York University School of Law and the Walter Leitner International
Human Rights Clinic at the Leitner Center for International Law and Justice at

Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.  *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

402.    In July 2020, the New York State Office of the Attorney General ("AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[7]

403.    Plaintiff herein incorporates by reference into this case the facts set forth in the AG Report.

404.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

405.    The report specifically addressed and condemned the common NYPD practice of discrediting organizers and demonstrators—and utilizing excessive force or other abusive tactics against them—by labeling them "outside agitators" and falsely claiming police recovered weapons and other evidence of violent intent.[8]

---

[7] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
[8] *Id.*

406.    In one such incident, after NYPD members violently cracked down upon demonstrators in Mott Haven, Bronx County, in a widely-condemned show of brutal and excessive force, Defendant City's policymakers claimed that "gas cannister" and incendiary devices had been recovered from arrested demonstrators, and that these demonstrators were primarily "outside agitators."[9] These allegations were unfounded.[10]

407.    Human Rights Watch also addressed the Mott Haven protest and the policies and practices of the NYPD's protest-related responses in its September 30, 2020 report titled *"Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States* (HRW Report) which Plaintiff incorporates by reference.[11]

408.    The HRW Report confirmed that allegations by the NYPD and Defendant City regarding the supposed recovery of weapons from protestors were unfounded, finding that the concerted effort to suggest otherwise "appears to have been a deliberate effort at fearmongering on the part of the NYPD to help justify their planned crackdown on a group that is known to be critical of the police and capable of mobilizing public pressure."[12]

409.    The HRW Report further identified and condemned the labeling of protestors as "outside agitators" as a tactic to suppress and delegitimize legitimate and nonviolent demonstrations using false smears and fearmongering tropes.[13]

---

[9] *Id.*
[10] *Id.*
[11] Human Rights Watch, *"Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States*, Sept 2020, *available at*;
https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.
[12] *Id.*
[13] *Id.*

410.    The "outside agitator" or "professional protestor" trope has significant historical context, as it was regularly weaponized against the American Civil Rights Movement of the 1950s and 1960s.

411.    Its purpose—to discredit protestors and organizers—remains the same today.[14]

412.    In a 2020 interview with *The New York Times*, Thomas C. Holt, a professor of African-American history at the University of Chicago and civil rights activist who organized in the 1960s, said this of the "outside agitator" trope: "The notion — or rather fiction — of the 'outside agitator' was a persistent trope, especially during the early years of the civil rights movement. Part of the motivation for the charge was to sustain the myth that the locals were satisfied with things as they were, and if you could just crack down on the outsiders, the protests would cease. As the movement grew and spread, that myth became more difficult to sustain."[15]

413.    Indeed, Dr. Martin Luther King, frequently accused of orchestrating and participating in outside agitation himself, decried the label in his Letter from Birmingham Jail: "I am cognizant of the interrelatedness of all communities and states. I cannot sit idly by in Atlanta and not be concerned about what happens in Birmingham. Injustice anywhere is a threat to justice everywhere. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly affects all indirectly. Never again can we afford to live with the narrow, provincial 'outside agitator' idea. Anyone who lives inside the United States can never be considered an outsider."[16]

---

[14] Jacey Fortin, *The Long History of the Outside Agitator*, THE NEW YORK TIMES, *available at*: https://www.nytimes.com/2020/06/08/us/outside-agitators-history-civil-rights.html.
[15] *Id.*
[16] King, M.L. (1963). Letter from Birmingham Jail. THE ATLANTIC MONTHLY, August 1963; *The Negro Is Your Brother*; Volume 212, No. 2; pages 78 - 88 (emphasis added).

*Defendant City's Failure to Discipline in Instances of Excessive Force and Police Responses to Protesters that Violate the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution*

414.    In December of 2020, the NYC Department of Investigation also issued a report examining the NYPD's conduct in response to the 2020 protests ("DOI Report").[17]

415.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[18]

416.    In addition to noting the heavy-handed response by the Strategic Response Group (SRG) at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[19]

417.    The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

418.    The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

419.    The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

---

[17] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[18] *Id.* at 36.
[19] *Id.* at 61.

420.    The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[20]

421.    According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[21]

422.    Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to protests and/or demonstrations, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

423.    Despite the wealth of historical and contemporaneous notice of the deficient and abusive conduct of the NYPD in response to content-specific protests available to Defendants, and despite their notice of the dangers this conduct poses to New Yorkers such as Plaintiff, Defendants have not only failed to remediate these harms but have rewarded and protected individual NYPD members who engage in abusive behavior against demonstrators, continuing to foster a culture of selective protest suppression within the Department.

424.    Since the ascension of **DEFENDANT ADAMS** to City Hall, Defendant City and its NYPD policymakers have repeatedly declined to take any meaningful disciplinary action—or any disciplinary action whatsoever—against NYPD members who have been determined to have acted in an excessively forceful or otherwise unconstitutional manner.

425.    Indeed, Defendants' policies and practices of permitting and encouraging abusive conduct—specifically protest-related responses by the NYPD—signify an endorsement, and even

---

[20] DOI Report at 56.
[21] *Id.* at 28.

an escalation, from these practices by prior administrations, including those policies and practices decried in the Summer 2020 reports by the Attorney General, the DOI, Human Rights Watch, and other agencies and human rights organizations.

426.    Between 2021 and 2023, the NYPD, by Commissioner Keechant Sewell, rejected more than half of all recommendations of discipline for NYPD members made by the Civilian Complaint Review Board (CCRB).[22]

427.    The frequency with which the NYPD rejects any suggestion of repercussions for police abuse has continued to increase.

428.    In his first year as Commissioner, Police Commissioner Caban declined to implement discipline in at least thirty (30) cases in which the NYPD members themselves had, through legal counsel, already agreed to the implementation of discipline, the highest rate in a decade.[23] By contrast, Commissioner Sewell—herself retaining and/or departing from CCRB recommendations at a tremendous pace—had done this in just four (4) such matters during her first year.[24]

429.    In December 2023, for example, Commissioner Caban rejected the CCRB's recommendation of discipline for NYPD members who intentionally drove NYPD vehicles into a crowd of Black Lives Matter demonstrators in May 2020, with Commissioner Caban declining to impose any discipline at all.[25]

---

[22] *See* Maria Cramer, *N.Y.P.D. Rejected Over Half of Review Board's Discipline Recommendations*, THE NEW YORK TIMES (Mar 16, 2023), *available at*: https://www.nytimes.com/2023/03/16/nyregion/nypd-discipline-recommendations.html.
[23] *See* Eric Umansky, *How the N.Y.P.D. Quietly Shuts Down Discipline Cases Against Officers*, THE NEW YORK TIMES (June 27, 2024), *available at*: https://www.nytimes.com/2024/06/27/nyregion/how-the-nypd-quietly-shuts-down-discipline-cases-against-officers.html.
[24] *Id.*
[25] *See* Yoav Gonen, *NYPD Imposes No Discipline on Cops Who Drove SUVs into Protesters*, THE CITY (Dec 8 2023), https://www.thecity.nyc/2023/12/08/nypd-no-discipline-cops-suvs-protesters-brooklyn/.

430.    Moreover, high-ranking NYPD officials continue to personally participate in and/or direct this conduct by subordinates, modelling abusive and content-selective enforcement against protestors and fostering a policy and practice of this conduct. This was the case both before and after the injuries sustained by Plaintiffs.

431.    Defendant City exhibited deliberate indifference to Plaintiffs' rights secured by the First, Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD Members, despite full knowledge of the members' wrongful acts, as described herein.

## SECOND CLAIM FOR RELIEF

**First Amendment Violations, Including First Amendment Retaliation**
***Against all Individual Defendants' Violations of Plaintiffs' Rights Pursuant <u>to 42 U.S.C. §
1983</u> and the First and Fourteenth Amendments to the United States Constitution,
and Against Defendant City Pursuant to <u>Monell v. Department of Social Services</u> (436
U.S. 658 [1978])***

432.    Plaintiffs hereby incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

433.    Viewpoint-based discrimination is presumptively unconstitutional in violation of the First Amendment, in any setting. Its harms are amplified in the university setting, such as here, because they interfere with long-recognized academic freedom principles.

434.    Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, in unlawfully seizing Plaintiffs, in subjecting Plaintiffs to excessive force, in selectively enforcing laws and regulations against Plaintiffs, in subjecting Plaintiffs to Defendants' protest policing policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

435.    In addition to being retaliatory, the restrictions Plaintiffs complains of herein, which Defendants imposed upon Plaintiffs' First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment, were themselves regulations on Plaintiffs' protected conduct that:

      a.    Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

      b.    Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

      c.    Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiffs' abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

      d.    Amounted to the imposition of strict liability on Plaintiffs for engaging in protected speech and/or expression.

436.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

437.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

438.    Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to subjecting Plaintiffs to Defendants' harmful policies, and in otherwise violating Plaintiffs' rights and engaging in the acts and omissions complained of herein.

439.    Defendants further engaged in retaliation against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment, including, *inter alia*, their protected conduct in:

      a.  Engaging in pro-Palestine protest speech; and

      b.  Associating with protesters of Palestinian national origin.

440.    This retaliation included, but is not limited to:

      a.  Excessive force against protesters while making statements indicating viewpoint-animus as a motivating cause for the force;

      b.  Planting evidence against protesters while making statements indicating viewpoint-animus as a motivating cause for the force;

      c.  Publishing protesters' names, home addresses, and arrest charges, which they have a limited privacy interest in, while not doing the same for similarly-situated individuals; and

      d.  Public officials making comments falsely maligning the protesters.

441.    Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiffs' protected speech and/or conduct.

442.    Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiffs from engaging in similar protected conduct in the future.

443.    Defendants did force Plaintiffs to experience actual chill, including by banning Plaintiffs from entering CCNY campus, a public location.

444.    Additionally, as discussed elsewhere herein, **DEFENDANT CITY** designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of his First Amendment rights.

445.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

446.    Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiffs' First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiffs.

447.    Upon information and belief, Defendants did not subject other others similarly situated to Plaintiffs in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

448.    Plaintiffs suffered actual chill, including in that Plaintiffs were prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered concrete harms and monetary loss.

449.    Plaintiffs' have experienced ongoing chilling of their pro-Palestinian speech due to actions of Defendants.

450.    Defendants' conduct has, by design and intentionally, communicated to Plaintiffs that if Plaintiffs participate in future pro-Palestinian protests, they risk arrest without notice to disperse, publication of their names and current addresses, and excessive force by the NYPD and CUNY officers.

451.    In the aftermath of their protest arrests, **DEFENDANT CITY and DEFENDANT ADAMS** have only defended and heightened risk of viewpoint-specific punishment of pro-Palestine speech, including especially campus speech.

452.    Plaintiffs also have reason to believe that they will experience police violence due to their association or perceived associations with Palestinians.

453.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CLAIM FOR RELIEF

### Excessive Force

*Against Defendants CUNY Does #1-5, CUNY Officer Melendez, CUNY Officer Yaccarino, CUNY Officer Frederick, CUNY Officer Clarke, NYPD Officer Kim Pierre, NYPD Defendant Does #18 - 22 and #33– 35, and NYPD Defendant Does #35 – 36 Pursuant to 42 U.S.C. § 1983 for Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution and Against Defendant City Pursuant to 42 U.S.C. § 1983 and* <ins>Monell v. Department of Social Services</ins> *(436 U.S. 658 [1978]) and New York State Law*

454.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

455.    Defendants' use of excessive force against Plaintiffs were unjustified, objectively unreasonable, and clearly intended as punishment when taking into consideration the facts and circumstances that confronted Defendants.

456.    This excessive force included physical assault, overly-tight handcuffing, and failure to loosen overly-tight handcuffing when put on notice by Plaintiffs that the handcuffs were overly-

tight. Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein. Defendants' use of excessive force against Plaintiffs were unjustified, objectively unreasonable, and clearly intended as punishment when taking into consideration the facts and circumstances that confronted Defendants.

457.    This excessive force included physical assault, overly-tight handcuffing, and failure to loosen overly-tight handcuffing when put on notice by Plaintiffs that the handcuffs were overly-tight.

458.    As described *supra*, this excessive force further constitutes a policy and/or practice designed and implemented by Defendant City in its viewpoint-specific protest policing responses.

459.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

460.    At no time did any Defendants intervene in the impermissible and/or abusive and/or otherwise deficient conduct of any other Defendants.

## FOURTH CLAIM FOR RELIEF

### Excessive Force and Unlawful Search and/or Seizure

*Against DEFENDANT CITY and DEFENDANT NYPD MEMBERS Pursuant to the New York State Constitution and the New York City Administrative Code Chapter 8, Title 8, § 8-801 et seq.*

461.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

462.    **DEFENDANT NYPD MEMBERS** are covered individuals as defined in NYC Admin. Code Ch. 8, Tit. 8, § 8-801.

463.    As described above, the Defendants violated Plaintiffs' right to be free from "unreasonable searches and seizures, and to be secure against the use of excessive force regardless of whether such force is used in connection with a search or seizure."

464.    Through Defendants' conduct described herein, Defendants utilized excessive force against Plaintiffs and subjected them to unreasonable searches and seizures.

465.    This excessive force included overly-tight handcuffing as well as an ongoing subsequent refusal to loosen such overly-tight handcuffs, striking **PLAINTIFF BELLUSCI** with batons, and the additional instances of excessive force described herein.

466.    **PLAINTIFFS ATAHUALPA**, **THOMPSON**, **CHOU**, and **BELLUSCI** were searched at CCNY and at 1PP, and each of their property was seized.

467.    Defendants' conduct injured Plaintiffs, caused them to expend costs, deprived them of their liberty and property interests, and otherwise caused damages to Plaintiffs.

468.    The NYPD Defendants and their employer, including the Defendant City, are liable to Plaintiffs for this conduct and the resulting damages and injuries.

469.    CUNY Defendants acted as agents of the NYPD and also independently to detain Plaintiff and escort Plaintiffs to 1PP.

470.    CUNY Defendants are liable to Plaintiffs for this conduct and the resulting damages and injuries.

471.    Under this provision, Defendants may not invoke the defense of qualified immunity to preempt Plaintiffs' suit against them.

472.    Under this provision, Plaintiffs are entitled to compensatory and punitive damages, attorney's fees and costs, and an order restraining the Defendants from engaging in further violative conduct.

## FIFTH CLAIM FOR RELIEF

### Failure to Prevent Civil Rights Violations

### *Against All Defendants Pursuant to 42 U.S.C. § 1986*

473.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

474.    Defendants had knowledge that the wrongs conspired to be done against Plaintiff in violation of 42 U.S.C. § 1985 were to be committed and had the power to prevent and/or aid in preventing the commission of this conduct.

475.    Defendants neglected and/or refused to prevent the commission of this conduct and Plaintiff sustained harm and/or the exacerbation of harm and the deprivation of his rights as a result of this failure.

476.    Defendants are liable for all damages caused by the conspiratorial conduct they failed to prevent despite possessing the power to do so.

## SIXTH CLAIM FOR RELIEF

### Conspiracy

### *Against Defendant Adams and Defendant City Pursuant to 42 U.S.C. § 1985(3)*

477.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

478.    Through the conduct described and complained of herein, **DEFENDANT ADAMS** conspired with members of the WhatsApp group "Israel Current Events," who attended a Zoom meeting with **DEFENDANT ADAMS** deprive Plaintiffs of the equal protection of the laws, or of equal privileges and immunities of the laws.

479.    **DEFENDANT ADAMS** conspired with the private and/or third party individuals on the Zoom meeting to deprive Plaintiffs of their civil rights pursuant to 42 U.S.C. § 1983, including

their First Amendment rights as pro-Palestinian protesters, and did so knowingly in exchange for political and/or financial benefits.

480.    This included **DEFENDANT ADAMS** utilizing donor-funded and donor-organized outside private investigators to target pro-Palestinian protesters in exchange for political and/or financial benefits.

481.    **DEFENDANT ADAMS** utilized his position of power, policymaking, and control over Defendant City's NYPD to craft police protest responses and to shape the public narrative regarding Plaintiffs' arrests as part of this conspiracy.

482.    **DEFENDANT ADAMS** acted in furtherance of this conspiracy against Plaintiffs, and as a result of this conduct, Plaintiffs were injured in their person and property deprived of constitutional and civil rights.

## SEVENTH CLAIM FOR RELIEF

### Unreasonable Denial and/or Delay of Medical Care

***On Behalf of Plaintiff Bellusci Against NYPD Does # 9-12 Pursuant to New York State Civil Rights Law Article 3 § 28 (N.Y. Civ. § 28) as well as New York State Common and Constitutional Law***

483.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

484.    **PLAINTIFF BELLUSCI** was denied access to medical care, including access to her medications for a serious diagnosed medical condition, and treatment for her injuries.

485.    **DEFENDANT NYPD MEMBERS** confiscated **PLAINTIFF BELLUSCI's** prescription medication, bearing her true name, and were informed and aware of the medical necessity of treatment for **PLAINTIFF BELLUSCI**, and failed to ensure **PLAINTIFF BELLUSCI** was provided medical care.

486.    This prescription medication treated serious medical conditions of Plaintiff.

487.    Without access to these medications, Plaintiff experience serious medical consequences of medication withdrawal that NYPD Defendants failed to address.

488.    At the time of the incident giving rise to the instant Complaint, Plaintiffs were in the custody of **DEFENDANT NYPD MEMBERS**, who are each a "police officer, peace officer or other law enforcement representative or entity" within the meaning of the New York State Civil Rights Law.

489.    As such, **DEFENDANT NYPD MEMBERS** had a duty to provide assistance and treatment for Plaintiff's medical needs.

490.    Defendants abdicated their duties under this statute and failed to provide and/or delayed in providing medical care to Plaintiffs while they were in Defendants' custody.

491.    Such denial and/or delay was unreasonable and caused delay in treatment for a serious physical and/or emotional injury of **PLAINTIFF BELLUSCI.**

492.    This failure resulted in serious injury and/or the exacerbation of Plaintiff's injuries and further caused Plaintiffs exacerbated pain and suffering for which **DEFENDANT NYPD MEMBERS** and their employer, **DEFENDANT CITY**, are liable.

493.    Plaintiff experienced damages from these claims as detailed above.

494.    **DEFENDANT NYPD MEMBERS**, and their employer, **DEFENDANT CITY**, are liable for these damages.

## EIGHTH CLAIM FOR RELIEF

### Violations of Plaintiffs' Fair Trial Rights

***Against All Individual Defendants Pursuant to 42 USC § 1983 and the Sixth and Fourteenth Amendments of the United States Constitution and Against Defendant City Pursuant to 42 U.S.C. § 1983***

495.    Plaintiffs incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

496.    **DEFENDANT NYPD** and **CUNY MEMBERS** were investigating officials involved in arresting and investigating the circumstances of the events described herein.

497.    While performing their duty as members of CUNY and the NYPD, Defendants fabricated evidence likely to influence a jury's decision, were that information to be presented to a jury, and forwarded that information to prosecutors.

498.    Defendants disseminated false information to prosecutors, the Court, the media, and the public to intentionally misrepresent the circumstances of Plaintiffs' arrests and/or Defendant City's response to this incident in an attempt to exonerate themselves of wrongdoing, discredit Plaintiffs, and taint prosecutors and/or any potential jury pool and/or finder of fact.

499.    As detailed above, Defendants falsely asserted, in information shared with prosecutors and/or the public:

   a.   That protesters, including Plaintiffs had been lawfully advised to leave campus and been provided an opportunity to do so;

   b.   That protesters, including **PLAINTIFF ATAHUALPA** and **PLAINTIFF CHOU**, were inside a campus building;

   c.   That protesters, including Plaintiffs, were violent;

   d.   That protesters, including Plaintiffs, were "outside agitators"; and

e. That protestors, including Plaintiffs, were not lawfully present on the CCNY campus.

500. Furthermore, Defendants falsely destroyed property, chipping glass and breaking objects in the room with arrestees, planting them next to protesters to falsify and justify high-level arrest charges.

501. These deprivations include: Plaintiffs' detentions in NYPD's custody prior to arraignment; interference with Plaintiffs' rights to privacy, quiet enjoyment of their homes and property; causing Plaintiffs to fear for their family's safety; professional wages and opportunities; and Plaintiffs' mandated return to Court during the pendency of the criminal case against them.

502. **PLAINTIFFS ATAHUALPA**, **THOMPSON**, **CHOU**, and **BELLUSCI** were each thereby forced to attend on or about two court appearances during the pendency of their criminal cases.

## NINTH CLAIM FOR RELIEF

### Equal Protection Violations

*Against All Individual Defendants Pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution and Against Defendant City Pursuant <u>to 42 U.S.C. § 1983</u> and as against Defendant City pursuant to <u>Monell v Department of Social Services</u> (436 U.S. 658 [1978])*

503. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

504. Plaintiffs, compared with others similarly situated, were selectively treated by Defendants, and such selective treatment was based on impermissible considerations such as association with those of Palestinian national origin, viewpoint-specific discrimination on the basis of pro-Palestinian speech, and/or an intention to inhibit or punish the exercise of constitutional rights and/or with a malicious or bad faith intent to injure a person.

84

505.    CUNY and NYPD Defendants acted in concert and used each other as agents to effectuate this discriminatory treatment.

506.    In the case of NYPD defendants, the NYPD has a demonstrable track record of treating pro-Palestinian protesters with a malicious and bath faith intent to punish them for pro-Palestinian speech.

507.    This punishment includes wrongful arrest, excessive force, mistreatment in custody, and "doxxing" protester identities to the media to facilitate public shaming and targeting.

508.    The animus underlying this differential treatment was underscored and demonstrated by Defendants mockingly stating "go Israel" while protesters were in custody and mocking protesters for their pro-Palestine speech.

509.    For example, when compared with pro-Israel comparators: the NYPD used excessive force against pro-Palestine protesters who were peaceful but declined to use any force at all against pro-Israel comparators, even when such comparators were engaged in violent and/or threatening conduct.

510.    Additionally, the NYPD, upon information and belief, did not release the home addresses or arrest charges to the press of pro-Israel protesters who were arrested and taken into custody, while it did do so for pro-Palestinian protester Plaintiffs.

511.    In the case of CUNY defendants, CUNY Defendants utilized excessive force, mistreatment in custody, and wrongful detention of protesters with a malicious and bath faith intent to punish them for pro-Palestinian speech and association with those of Palestinian national origin.

512.    The animus underlying this differential treatment was underscored and demonstrated by Defendants mocking a protester of Palestinian national origin and mocking protesters for their pro-Palestine speech.

513. This disparate treatment was applied on the basis of Plaintiffs' protest speech and was on the basis of Plaintiffs' association with protesters of Palestinian ethnicity or nationality.

514. Plaintiffs were treated differently than an identifiable, similarly situated group of individuals for malicious reasons and/or were intentionally treated differently from others similarly situated without rational basis for this difference in treatment.

515. Plaintiffs were injured as a result of Defendants' conduct.

516. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## TENTH CLAIM FOR RELIEF

### Failure to Intervene

*Against Defendants Taish Rochester, Keisha Frederick, Christopher Melendez, Katrina Harris, Khalid Clarke, Irving Rivera, Jeffery Pawell, Daniel Yaccarino, Gabriel Fernandez (Badge No. 1887), Robby Valdez (Badge No. 21848), Anderson R. Villanueva (Badge No. 4041), Kim Pierre (Badge No. 13800), Dawn Johnson (Badge No. 4887), NYPD Defendants John and Jane Doe #1–50, CUNY Defendants John and Jane Doe #1–5 Pursuant to 42 U.S.C. § 1983 and Against Defendant City pursuant to* **Monell v Social Svcs** *(436 U.S. 658 [1978])*

517. Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

518. The **DEFENDANT CITY**, by its agents, had a special duty to Plaintiffs and possessed sufficient knowledge that inaction would lead to the harms suffered by Plaintiffs.

519. **CUNY DEFENDANTS** had a special duty to Plaintiffs and possessed sufficient knowledge that inaction would lead to the harms suffered by Plaintiffs.

520. Defendants witnessed and/or knew of the harmful conduct of fellow Defendants and merely observed and/or unreasonably ignored such conduct against Plaintiffs.

521.    At no time did any Defendants intervene in this conduct or otherwise mitigate the dangers this conduct posed to Plaintiffs.

522.    **DEFENDANT CITY** and its employees and/or agents, as well as CUNY employees and/or agents breached the existing duty to protect Plaintiffs, and such inaction enabled and/or facilitated and/or exacerbated the harms caused by Defendants' conduct and suffered by Plaintiffs.

## ELEVENTH CLAIM FOR RELIEF

### Assault and Battery

***Against Defendants City of New York, CUNY Defendant Does #1-5, NYPD Officer Kim Pierre and CUNY Officer Christopher Melendez, CUNY Officer Yaccarino, NYPD Defendant Does #18 - 22 and #33– 35, and NYPD Defendant Does #35 – 36 Pursuant to New York State Law***

523.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

524.    As a result of the foregoing, Plaintiffs were placed in apprehension of imminent harmful and offensive bodily contact without privilege or consent.

525.    **PLAINTIFF JOSSELYN ATAHUALPA** experienced assault and battery from **CUNY OFFICER IRVING RIVERA** and Officer Yaccarino in her arrest.

526.    **PLAINTIFF MARVIN THOMPSON** experienced assault and battery from **NYPD OFFICER KIM PIERRE** and **CUNY OFFICER CHRISTOPHER MELENDEZ** in his arrest.

527.    Plaintiff Sara Bellusci experienced assault and battery from NYPD Defendant Does #18 - 22 and #33– 35 who pepper sprayed her.

528.    NYPD Member believed to be **DEFENDANT PAWELL** and six other **DEFENDANT DOES, NYPD DEFENDANT DOES #35 - 36**, and CUNY Defendant Does, **CUNY DEFENDANT DOES #25 – 28** assaulted and battered **PLAINTIFF SARA BELLUSCI** with batons in the bathroom.

529.    **NYPD DEFENDANT DOES #35 - 36** and **CUNY DEFENDANT DOES #25 - 28** assaulted and battered **PLAINTIFF SARA BELLUSCI** by applying overly-tight handcuffs to **PLAINTIFF BELLUSCI**'s wrists.

530.    **CUNY DEFENDANT DOES #2 AND #3** assaulted and battered **PLAINTIFF PATRICIA CHOU** by applying overly-tight handcuffs to her wrists.

531.    As a result of NYPD Officers' tortious conduct, Plaintiffs suffered physical injury and mental anguish.

532.    NYPD Officers assaulted Plaintiffs at the Protests while acting within the scope of their employment.

533.    Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

534.    **DEFENDANT NYPD and CUNY MEMBERS** made offensive contact with Plaintiffs at the Protests without privilege or consent.

535.    As a result of **DEFENDANT NYPD and CUNY MEMBERS'** tortious contact, Plaintiffs suffered physical injury and mental anguish.

536.    Defendant NYPD Members battered Plaintiffs at the Protests while acting within the scope of their employment.

537.    Defendant City of New York, as the employer of NYPD Officers, is responsible for the wrongdoing of NYPD Members under the doctrine of *respondeat superior*.

## TWELFTH CLAIM FOR RELIEF

### False Arrest and Imprisonment

### *Against Individual Defendants and Defendant City Pursuant to New York State Law*

538.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

539.    **DEFENDANT NYPD and CUNY MEMBERS** unlawfully seized **PLAINTIFFS** at the protests, wrongfully detaining and confining them without privilege or consent.

540.    NYPD and CUNY Officers falsely imprisoned **PLAINTIFFS**. NYPD Defendants are responsible for the wrongdoing of NYPD Officers under the doctrine of *respondeat superior*.

## THIRTEENTH CLAIM FOR RELIEF

### Excessive/Unreasonable Detention

### *Against All Individual Defendants and Defendant City Pursuant to New York State Law*

541.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

542.    By the actions described above, the Defendants described above did excessively detain Plaintiffs within the meaning of New York common law.

543.    Defendants held Plaintiffs in custody for an excessive period of time for the purpose of gathering additional evidence to justify Plaintiffs' arrest and/or due to ill will on the part of Defendants against Plaintiffs and/or to cause delay for delay's sake.

544.    Plaintiffs were held in custody for over 40 hours prior to their arraignments.

545.    Plaintiffs were conscious of their confinement by Defendants, and this confinement was undertaken without their consent.

## FOURTEENTH CLAIM FOR RELIEF

### Negligence

### *Against All Individual Defendants and Defendant City Pursuant to New York State Law*

546.     Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

547.     Defendants owed a special duty to Plaintiffs and breached this duty through their conduct described herein. Defendants' negligence in fulfilling their duty to Plaintiffs resulted in Plaintiffs' injuries and they are liable for this conduct and its resulting injuries.

548.     This negligence consisted, *inter alia*, of negligence in supervision; negligence in adherence to existing protocol; deprivation of Plaintiffs' civil rights, privilege and immunities secured under the Constitution of the United States of America and State of New York; and negligence in failing to use care in performance of duties for which a reasonably prudent and careful individual in Defendants' respective position would have used in similar circumstances.

549.     In instances where Defendants owed a special duty of care to Plaintiffs whom they injured or whom they witnessed being injured by other Defendants, they violated this special duty by failing to intervene to prevent injury, and by failing to seek and/or provide medical aid.

550.     Defendants' negligent failure to intervene and seek and/or provide medical aid to Plaintiffs injured at the protests proximately caused those individuals further injury.

551.     Defendants further did not have discretion to deny medical aid to Plaintiffs injured by NYPD Members at the Protests. The NYPD Patrol Guide Procedure Number 221-02 requires NYPD Members to "ensure [that an injured or ill] subject receives proper medical attention" and to "[e]nsure subject receives immediate medical attention and provide first aid, if appropriate and

properly trained, if subject is having difficulty breathing or demonstrates potentially life-threatening symptoms or injuries."

552.    As a result of Defendants' negligence, Plaintiffs were injured and suffered further damages.

## FIFTEENTH CLAIM FOR RELIEF

**Violations of New York State Human Rights Law and New York City Human Rights Law for Discrimination in Public Accommodations, and Violations of New York State Human Rights Law for Discrimination in Education**

*Against All Defendants Pursuant to the NYCHRL § 8 and NYSHRL*

553.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

554.    Both NYCHRL and NYSHRL prohibit discrimination on the basis of national origin in public accommodations.

555.    The NYSHRL prohibits discrimination on the basis of national origin in education.

556.    School campuses constitute public accommodations under both the NYCHRL and NYSHRL.

557.    CCNY is further an educational institution covered by the discrimination protections of the NYSHRL.

558.    Both the NYCHRL § 8 and NYSHRL prohibit associational discrimination, or discrimination based on the protected status "of a person with whom such a person has a known relationship or association."

559.    **NYPD DEFENDANTS**, **DEFENDANT ADAMS**, and **CUNY DEFENDANTS** subjected Plaintiffs experienced illegal and targeted school security harassment, including excessive force, due to their association or perceived association with Palestinians, including Palestinian protesters while present on CUNY's CCNY campus, a place of public accommodation.

560.    CCNY further utilized the NYPD Defendants as agents to further this discrimination against Plaintiffs.

## SIXTEENTH CLAIM FOR RELIEF

### Negligent Infliction of Emotional Distress

### *Against All Individual Defendants and Defendant City Pursuant to New York State Law*

561.    Defendants owed Plaintiffs a duty of care and breached this duty of care through the conduct described herein, directly causing the emotional harms, including post-traumatic stress, insomnia, depression, and ongoing anxiety and fear.

## SEVENTEENTH CLAIM FOR RELIEF

### Conversion

### *Against All Individual Defendants and Defendant City Pursuant to New York State Law*

562.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

563.    **DEFENDANT NYPD and CUNY MEMBERS** permanently damaged Plaintiffs' property without consent or lawful authority to do so.

564.    **DEFENDANT NYPD and CUNY MEMBERS** permanently deprived Plaintiffs of their property without consent or lawful authority to do so.

565.    The full value of these items is not yet known.

566.    **DEFENDANT NYPD and CUNY MEMBERS** are liable to Plaintiffs for these damages.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs respectfully seek relief from this Court and demands judgment against the individual Defendants and the City of New York in the following forms:

    a.  Awarding compensatory damages in an amount to be determined at trial;

    b.  Awarding punitive damages in an amount to be determined at trial;

    c.  Awarding attorneys' fees, costs, and disbursements in an amount to be determined at trial;

    d.  Awarding prejudgment interest in an amount to be determined at trial;

    e.  Issue an order holding unlawful, vacating, and setting aside the Defendants' policies or practices of employing excessive force and false arrests, suppressing free expression, and retaliating against New York Residents who participate in pro-Palestinian protests;

    f.  Declare that Defendants' acts and omissions are unconstitutional under the United States Constitution, the New York State Constitution, and New York state tort law;

    g.  Enjoin Defendants and all their officers, employees, and agents, and anyone acting in concert with Defendants, from implementing, applying, or taking any action whatsoever under its unconstitutional policies or practices of employing excessive force, false arrests, and retaliatory tactics against protesters who participate in the pro-Palestinian protests in the form of an order requiring Defendants to take all affirmative steps, including changing policies, conducting training, and undergoing monitoring, among others, to ensure that Defendants: (i) achieve compliance with the United State Constitution, New York State Constitution, and state tort law in

policing protests; (ii) eliminate ongoing unlawful policing practices and their

effects, and (iii) prevent this unlawful conduct in the future;

h.  Enjoin the NYPD from its retaliatory and viewpoint-specific practice of releasing

the names and addresses of arrested protesters to the news media;

i.  Provide any other relief deemed just and equitable.

**Dated:**        Brooklyn, New York
              December 30, 2025

                              Respectfully submitted,

                              **KAISHIAN & MORTAZAVI LLC**
                              Attorneys for Plaintiff


                              Maryanne K. Kaishian
                              55 Washington Street, Ste. 461
                              Brooklyn, New York 11201
                              T: (347) 662-2421
                              E: eservice@kaishianlaw.com


                              Callen Lowell
                              55 Washington Street, Ste. 461
                              Brooklyn, New York 11201
                              T: (347) 662-2421
                              E: eservice@kaishianlaw.com

## ATTORNEY'S VERIFICATION

**Callen Lowell,** an attorney duly admitted to practice law in the State of New York, states the following:

1. I am an attorney with **KAISHIAN & MORTAZAVI LLC** and I represent **PLAINTIFFS** in the above matter.

2. I have read the foregoing **AMENDED COMPLAINT** and know the contents thereof.

3. All information contained therein is true to my own knowledge, except as to the matter therein stated to be alleged on the information and belief and that as to those matters, I believe it to be true.

4. The reason this verification is made by me and not Plaintiffs is because Plaintiffs **JOSSELYN ATAHUALPA, MARVIN THOMPSON, PATRICIA CHOU** do not reside in the county wherein I maintain my office.

5. The grounds of my belief as to all matters not stated upon my knowledge and conversations with the Plaintiff and contents of the file maintained by Kaishian & Mortazavi LLC.

**Dated:**       Brooklyn, New York
                December 30, 2025


                        KAISHIAN & MORTAZAVI LLC
                        Attorneys for Plaintiffs


                        Callen Lowell
                        55 Washington Street, Ste. 461
                        Brooklyn, New York 11201
                        T: (347) 662-2421
                        E: eservice@kaishianlaw.com

## **PLAINTIFF VERIFICATION**

STATE OF NEW YORK )

COUNTY OF KINGS      )

**SARA BELLUSCI**, Plaintiff in the above matter, affirms the following under penalties of perjury:

1. I am the Petitioner in the above matter, Atahualpa et al. v City of New York, et al.

2. I am over 18 years old.

3. I am a resident of Kings County, City and State of New York.

4. I have read the attached Amended Complaint, dated December 30, 2025, and the same is true and to my own knowledge, except as to matters therein alleged to be on information and belief, and as to those matters, I believe them to be true.

**Dated:** Brooklyn, New York
          December 30, 2025                              SIGNED: _____

                                                              **SARA BELLUSCI**

STATE OF NEW YORK )
COUNTY OF KINGS      )

On the _____ day of 12/30/2025   in the year 2025, before me, the undersigned notary public, personally appeared _____Sara Bellusci_____, either by physical presence or, where so indicated by the Notary Seal below, via electronic means in accordance with my New York State license as an electronic notary. This individual is known to me, or, on the basis of satisfactory evidence provided to me, has proved to me to be the individual(s) whose name(s) is/are subscribed to the within instrument. The individual(s) acknowledged to me that they executed the same their capacity, and that by their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notarized online using audio-video communication

Notarized online using audio-video communication

_____
Notary Public

Sayed Masoud Mortazavi
Online Notary Public
State of New York
Kings County
Commission #: 02MO0029989
Commission Expires: 10/18/2028